NOT DESIGNATED FOR PUBLICATION

No. 113,321

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

In the Interest of K.C.M.-E.,
A Child Under Eighteen (18) Years of Age.

MEMORANDUM OPINION

Appeal from Reno District Court; PATRICIA MACKE DICK, judge. Opinion filed November 13, 2015. Affirmed.

*Shawnah K. Corcoran*, of Hutchinson, for appellant natural father.

*Marlo Hamrick*, of Kansas Legal Services, for appellant natural mother.

*Cheryl I. Allen*, assistant district attorney, and *Keith E. Schroeder*, district attorney, for appellee.

Before ARNOLD-BURGER, P.J., ATCHESON, J., and WALKER, S.J.

*Per Curiam*: Father and Mother, the natural parents of K.C.M.-E., appeal the district court's order terminating their parental rights. The district court determined Father and Mother were unfit, the conduct or condition rendering them unfit was unlikely to change in the foreseeable future, and termination of their parental rights was in K.C.M.-E.'s best interests. Father contends (1) insufficient evidence existed to support the district court's finding and (2) the agency handling K.C.M.-E.'s case hindered his efforts to fulfill the duties of a parent during his incarceration. Mother argues insufficient evidence existed to support the district court's finding.

1

K.C.M.-E. is the natural born child of Mother and Father. At birth, Mother was responsible for the caretaking of K.C.M.-E. because Father was incarcerated. Mother's living situation was sporadic, and she and K.C.M.-E. did not have a permanent residence.

On October 23, 2013, while staying with Father's parents, Mother was involved in a domestic violence dispute with Father's mother and sister. After the sister noticed K.C.M.-E. had fallen from Mother's bed, she began yelling at Mother. In K.C.M.-E.'s presence, the two women began to yell back and forth, and the altercation eventually escalated to physical violence.

Law enforcement later responded to the domestic violence dispute between Mother and Father's family members. The officers noted signs of physical injury to Father's mother and sister. The officers also observed Mother did not sustain any visible injuries in the dispute. Ultimately, the officers arrested Mother and placed K.C.M.-E. in police protective custody.

The following day, in light of Mother's arrest, the State filed a child in need of care (CINC) petition. The petition alleged K.C.M.-E. was a child in need of care based on Mother's unstable living arrangements and the domestic violence altercation between Mother and Father's family members.

On October 28, 2013, the district court held a temporary custody hearing. When neither Mother nor Father appeared for the hearing, the district court determined an emergency existed, which threatened K.C.M.-E.'s safety, and placed K.C.M.-E. in the temporary custody of the Kansas Department for Children and Families (DCF). The district court also ordered Mother submit to a full psychological evaluation.

That same day, DCF referred K.C.M.-E.'s case to St. Francis Community Services (St. Francis), an organization that helps families find permanency for their children through reintegration or adoption. On November 12, 2013, the district court held a pretrial hearing. At the hearing, Mother entered a statement of no contest to the State's petition. The district court determined K.C.M.-E. was without adequate parental care and ordered K.C.M.-E. to remain in the custody of DCF. The district court also ordered Father to complete paternity testing.

On October 2, 2014, the district court held a permanency hearing to determine whether reintegration remained a viable option. The district court found neither parent could provide for K.C.M.-E. and reintegration was therefore no longer available. The State filed a motion for finding of unfitness and termination of parental rights on November 4, 2014.

The district court convened a termination hearing on January 5, 2015. At the hearing, the State presented the testimony of a DCF social worker, several employees of St. Francis who were involved in K.C.M.-E.'s case, and Father. Mother testified on her own behalf.

With regard to Father's rights, the State presented the testimony of Jody Fowler, a representative for St. Francis. Shortly after K.C.M.-E.'s permanent placement in the custody of DCF, Father contacted Fowler to request a paternity test. During their conversation, Father advised Fowler that he did not want to be involved in K.C.M.-E.'s case until his paternity was confirmed. Fowler and Father did not have any subsequent communication after their telephone conversation, and neither party attempted to contact the other.

The State also presented the testimony of several St. Francis employees. Alisha Mayberry, a social worker with St. Francis, testified that St. Francis mailed Father a letter

of referral after receiving K.C.M.-E.'s case from DCF and notified Father of the first case plan meeting. Mayberry further testified, after learning that Father did not want to be involved until confirmation of paternity, St. Francis did not attempt to include Father in the case plan meetings. Mayberry admitted, even after St. Francis became aware of the results of Father's paternity, it still did not make any attempt to contact Father or include him in the reintegration process.

Finally, the State offered the testimony of Father. Beginning in 2010, Father spent significant time in both state and federal prison. During a period of release, Father learned of Mother's pregnancy and was aware that he may be the child's father. However, before K.C.M.-E.'s birth, Father was convicted on federal charges and sent back to prison. Other than a letter requesting paternity testing, Father did not make any other attempts to contact St. Francis or K.C.M.-E. Moreover, Father's prison did not offer programs relating to parenting, custody, or children.

At the termination hearing, Father addressed his criminal history. Father explained that he was incarcerated at a United States penitentiary in Florence, Colorado, based on a conviction for felony possession of ammunition. Father's release was scheduled for November 25, 2015. But he was awaiting the prosecution of pending charges in Sedgwick County for felony possession of methamphetamine and felony possession of a firearm. Father explained at trial that he would possibly be available before the scheduled release date depending on the outcome of the state charges. Father also explained that he was required to serve 3 years' probation following his prison sentence for the federal crimes.

With regard to Mother's rights, the State presented the same witnesses. Unlike Father, following K.C.M.-E.'s placement in protective custody, Mother began working with St. Francis in an effort to reintegrate K.C.M.-E. into Mother's care. At that time, Mother was homeless and unemployed. St. Francis scheduled a meeting with Mother in

4

early November 2013 to develop a case plan. The purpose of the case plan was to develop tasks for Mother, which would aid in establishing reintegration. Ultimately, Mother needed to complete the case plan tasks before K.C.M.-E. was returned to her care. However, Mother did not attend the November 2013 meeting, despite being informed she could attend via telephone. Mayberry testified that Mother seemed inconvenienced by the entire reintegration process, recalling Mother's response to the case plan meeting as "give [my] kid back and . . . the whole thing was stupid."

On November 27, 2013, Mother and Mayberry met for a worker/parent conference. At the conference, Mayberry indicated that she was available if Mother had any questions about the case plan. Mother did not have any questions for Mayberry and told her to "just give me my kid and I'll sign off on the worker/parent."

During the reintegration process, Mother lived in various homes. In January 2014, Mother obtained housing after being homeless for a period of time. By August 2014, Mother had moved into another home with two roommates. In December 2014, Mother moved into a two-bedroom home by herself. Mother planned for the second bedroom to be for K.C.M.-E. Mother acquired furniture, clothing, and toys in hopes of K.C.M.-E.'s return to her care. This was Mother's home at the time of the termination hearing.

Mother visited her son sporadically during the reintegration process. The visits typically took place at St. Francis' office. However, St. Francis, on one occasion, transported K.C.M.-E. to Wichita for a visit with Mother and K.C.M.-E.'s grandmother, who was ill and unable to travel. Out of 51 opportunities to visit her son, Mother only visited K.C.M.-E. on 13 occasions. This included 3 months in 2014 where Mother did not visit K.C.M.-E at all. When Mother did visit K.C.M.-E., the visits went well and Mother was described as "good with [K.C.M.-E.]."

5

Mother testified on her own behalf. She testified that, in December 2014, she obtained appropriate housing for K.C.M.-E., along with toys, clothing, and furniture for him. Mother admitted to missing a few case plan meetings and claimed she was unaware that she was required to complete all tasks listed on the case plan worksheet.

Mother testified that she was self-employed during the reintegration, explaining she ran a design and remodeling business. Mother further testified that she had obtained full-time employment as a server 3 months before the termination hearing and planned to continue her small business on the side.

When asked about visitation of K.C.M.-E., Mother confirmed that she only attended roughly one-fourth of the appointments. Mother claimed, however, this was the result of transportation issues. Although St. Francis provided transportation for visits, Mother felt she "wasn't respecting them by not being there [on the first two occasions St. Francis attempted to pick her up] so I quit asking for help for them to come get me."

Following closing arguments, the district court found Father and Mother were unfit to properly care for K.C.M.-E. and the conduct and condition rendering Father and Mother unfit was unlikely to change in the foreseeable future. In doing so, the district court determined Mother's testimony concerning her employment history was not credible. The district court further held it was in K.C.M.-E.'s best interests to terminate Father and Mother's parental rights.

Father and Mother timely appealed.

APPLICABLE LAW

An appellate court reviews a district court's decision to terminate parental rights by considering "whether, after review of all the evidence, viewed in the light most favorable

6

to the State, it is convinced that a rational factfinder could have found it highly probable, *i.e.*, by clear and convincing evidence," the parent's rights should be terminated. *In re B.D.-Y.*, 286 Kan. 686, 705, 187 P.3d 594 (2008). In making this determination, an appellate court does not reweigh conflicting evidence, judge the credibility of witnesses, or redetermine questions of fact. 286 Kan. at 705.

As the trier of fact, the district court is in the best position to determine the best interests of a child, and an appellate court will not disturb the district court's judgment in the absence of an abuse of discretion. *In re K.P.*, 44 Kan. App. 2d 316, 322, 235 P.3d 1255, *rev. denied* October 7, 2010. "Judicial discretion is abused when judicial action is arbitrary, fanciful, or unreasonable. If reasonable persons could differ as to the propriety of the action taken by the trial court, then it cannot be said that the trial court abused its discretion. [Citation omitted.]" *State v. Gant*, 288 Kan. 76, 81-82, 201 P.3d 673 (2009).

Under K.S.A. 2014 Supp. 38-2269(a), when a child is adjudicated a child in need of care, a district court may terminate the parent's rights if the moving party established, by clear and convincing evidence, "the parent is unfit by reason of conduct or condition which renders the parent unable to care properly for a child and the conduct or condition is unlikely to change in the foreseeable future." If the district court finds the parent unfit, the court must then determine whether termination of parental rights is in the child's best interests. K.S.A. 2014 Supp. 38-2269(g)(1).

*Termination of Father's parental rights*

On appeal, Father raises two related issues. First, Father contends the district court's finding that the condition rendering him unfit was unlikely to change in the foreseeable future was not supported by clear and convincing evidence. More specifically, Father claims the district court failed to give adequate weight to his testimony about his prospective release from prison.

Second, Father contends the agency handling K.C.M.-E.'s case hindered his efforts to assume the duties of a parent. Father asserts the agency failed to make any effort to apprise him of their services and failed to maintain contact with him during K.C.M.-E.'s attempted reintegration. Father maintains the agency's conduct prevented his meaningful involvement in K.C.M.-E.'s life.

1. *Fitness*

The Revised Kansas Code for Care of Children provides a nonexclusive list of factors the district court must consider when determining parental fitness. See K.S.A. 2014 Supp. 38-2269(b) and (c). The existence of any one of these factors "standing alone may, but does not necessarily, establish grounds for termination of parental rights." K.S.A. 2014 Supp. 38-2269(f). But the district court is not confined to the statutory factors in making its determination of parental fitness. See K.S.A. 2014 Supp. 38-2269(b).

In Father's case, the district court based its finding of unfitness on the following statutory factors:

- Father was a convicted felon and serving a term of imprisonment, pursuant to K.S.A. 2014 Supp. 38-2269(b)(5);
- Father demonstrated a lack of effort to adjust his circumstances, conduct, and conditions to meet K.C.M.-E.'s needs, pursuant to K.S.A. 2014 Supp. 38-2269(b)(8); and
- Father failed to maintain regular visitation, contact, and communication with K.C.M.-E., pursuant to K.S.A. 2014 Supp. 38-2269(c)(2).
- 

Father argues the evidence was insufficient to establish that his incarceration was a valid factor to support termination of his parental rights. See K.S.A. 2014 Supp. 38-

8

2269(b)(5). According to Father, the prison where he was incarcerated did not offer programs related to parenting, custody, or children, and St. Francis neglected to include him in the reintegration process. Essentially, Father pursued all of his possible options, because St. Francis denied him involvement in K.C.M.-E.'s life.

In support of this argument, Father cites *In re Adoption of F.A.R.*, 242 Kan. 231, 747 P.2d 145 (1987). In that case, the Kansas Supreme Court recognized a parent incarcerated for a long term cannot "provide the customary parental care and guidance ordinarily required." 242 Kan. at 236. The court explained, in such cases, the district court must consider the extent to which the imprisoned parent "pursued the opportunities and options which may be available to carry out such duties to the best of his or her ability." 242 Kan. at 236. Although *In re Adoption of F.A.R.* was an adoption case, this court has routinely applied its precepts in CINC cases as well. See *e.g.*, *In re S.D.*, 41 Kan. App. 2d 780, 790, 204 P.3d 1182 (2009); *In re D.T.*, 30 Kan. App. 2d 1172, 1174-75, 56 P.3d 840 (2002); *In re M.D.S.*, 16 Kan. App. 2d 505, 510-11, 825 P.2d 1155 (1992).

Here, Father's incarceration on a felony conviction was sufficient to support this factor. Father's argument that St. Francis failed to make reasonable efforts is misplaced. The principle articulated in *In re Adoption of F.A.R.* does not concern the actions of others. The real issue here is whether Father made reasonable efforts to carry out the duties of a parent, as best one can do while incarcerated. See *In re S.D.*, 41 Kan. App. 2d at 790. In Father's case, Father actually avoided involvement in K.C.M.-E.'s life until his paternity was definitively established. When paternity testing confirmed his parenthood, Father still made no attempt to contact St. Francis, the district court, Mother, or anyone else involved in K.C.M.-E.'s case. Instead, Father now blames St. Francis for not contacting him, claiming they denied him access to K.C.M.-E. However, if Father genuinely wanted to pursue all available options to carry out his parental duties, he would

9

have proactively contacted St. Francis to request involvement or visitation. But Father did nothing.

Notwithstanding Father's objections, we find the evidence sufficient to establish Father demonstrated a lack of effort to adjust his circumstances, conduct, and conditions to meet K.C.M.-E.'s needs, see K.S.A 2014 Supp. 38-2269(b)(8), and Father failed to maintain regular visitation, contact, and communication with K.C.M.-E., see K.S.A. 2014 Supp. 38-2269(c)(2). When Father learned Mother was pregnant with K.C.M.-E., he was on release from prison. Father had an opportunity to refrain from breaking the law and to provide for K.C.M.-E., but, before her birth, he was sent back to prison. This was an opportunity for Father to demonstrate an ability to conform his conduct for K.C.M.-E.'s needs, but he failed to do so. Furthermore, while incarcerated, Father did not make any efforts to contact K.C.M.-E. Instead, Father avoided his parental duties until paternity testing conclusively established his fatherhood. Even then, Father did not contact St. Francis or make any internal requests at his prison to visit or otherwise contact K.C.M.-E.

Therefore, sufficient evidence supported the district court's finding that Father was unfit to properly care for K.C.M.-E.

### 2. *Foreseeable future*

The next issue is whether clear and convincing evidence supported the district court's finding that Father's conduct or condition was unlikely to change in the foreseeable future. See K.S.A. 2014 Supp. 28-2269(a). An appellate court measures the "foreseeable future" from the child's perspective, considering the child's perception of time. *In re R.S.*, 50 Kan. App. 2d 1105, 1117, 336 P.3d 903 (2014).

Father argues the district court failed to give sufficient weight to his testimony that he would be available to assume parental duties in as little as 4 months.

10

Father's argument, however, asks the court to reweigh the evidence. See *In re B.D.-Y.*, 286 Kan. at 705. While there was a possibility that Father would be released in the spring of 2015, his scheduled release date was November 25, 2015. Moreover, Father admitted, at trial, his release was contingent on numerous factors, including pending state charges. By the time of trial, K.C.M.-E. had already been in foster care for 14 months. With the uncertainty of Father's release, the district court simply could not predict when Father was going to actually be able to assume parental duties.

Given the circumstances, sufficient evidence supported the district court's finding that Father's conduct and condition was unlikely to change in the foreseeable future.

3. *Best interests*

The last issue is whether the district court abused its discretion in determining that termination of Father's parental rights was in K.C.M.-E.'s best interests. K.S.A. 2014 Supp. 38-2269(g)(1); see *In re R.S.*, 50 Kan. App. 2d at 1116. In making this determination, a district court must give primary consideration to the physical, mental, and emotional needs of the child. K.S.A. 2014 Supp. 38-2269(g)(1).

Here, the district court reasonably concluded termination of Father's parental rights was in K.C.M.-E.'s best interests. By the time of the termination hearing, K.C.M.-E. was 22 months old. Because of Father's chronic incarceration, he had never had the type of contact with K.C.M.-E. that would develop a meaningful bond. Moreover, Father seemed disinterested in parenthood, and his release was indefinite. The district court remarked that young children, especially, need permanency and meaningful familial relationships. The court determined, being only an infant, K.C.M.-E. needed permanency, which Father could not provide. It was in K.C.M.-E.'s mental and emotional interests that he remain with his foster parents and continue to create strong bonds with them.

11

The district court did not abuse its discretion in determining that termination of Father's parental rights was in K.C.M.-E.'s best interests.

*Termination of Mother's parental rights*

Mother argues the State failed to establish, by clear and convincing evidence, she was unfit and the conduct or condition rendering her unfit was unlikely to change in the foreseeable future. Mother contends, despite the infrequent visits, "her relationship with [K.C.M.-E. was] fantastic." Mother further asserts that her obtaining full-time employment and appropriate housing demonstrates a willingness and ability to adjust her circumstances to meet K.C.M.-E.'s needs.

1. *Fitness*

The Revised Kansas Code for Care of Children provides a nonexclusive list of factors the district court must consider when determining parental unfitness. See K.S.A. 2014 Supp. 38-2269(b) and (c). The existence of any one of these factors may, by itself, be sufficient to establish grounds for termination of parental rights. See K.S.A. 2014 Supp. 38-2269(f). Moreover, the district court is not confined to the statutory factors in making its determination of parental fitness. See K.S.A. 2014 Supp. 38-2269(b).

In this case, the district court relied on the following factors in determining Mother was unfit:

- Mother demonstrated a lack of effort to adjust her circumstances, conduct, or conditions to meet K.C.M.-E.'s needs, pursuant to K.S.A. 2014 Supp. 32-2269(b)(8);
- Mother failed to maintain regular visitation, contact, and communication with K.C.M.-E, pursuant to K.S.A. 2014 Supp. 32-2269(c)(2);

12

- Mother failed to carry out the case plan directed toward the integration of K.C.M.-E. into Mother's home; and
- Mother's overall lack of motivation to bond with K.C.M.-E. or be a part of his upbringing.

Mother contends her securing full-time employment demonstrates that she was able to meet K.C.M.-E.'s needs. But the district court specifically held Mother's testimony concerning her employment history was not credible. This court does not pass on the credibility of witnesses. *In re B.D.-Y.*, 286 Kan. at 705. Therefore, this court cannot consider whether Mother's testimony about her employment history supports a contrary finding regarding her fitness.

Mother also contends that maintaining a relationship with K.C.M.-E. throughout the reintegration process and obtaining appropriate housing and things for K.C.M.-E. demonstrates she is a fit parent. The issue, however, is not whether facts exist in the record to support an alternative finding; the issue is whether, in light of the entire record, the evidence is sufficient to support the district court's finding. See *In re B.D.-Y.*, 286 Kan. at 705.

St. Francis tried to work with Mother for over 1 year, with the goal of reintegrating K.C.M.-E. into her care. Throughout the process, Mother demonstrated a total lack of motivation and commitment to the process. Mother was offered over 50 visitation appointments but only attended 13 times. Essentially, over the course of 1 year, Mother only visited K.C.M.-E. roughly once a month. Furthermore, Mother was unable, or unwilling, to complete case plan tasks in a timely manner. Mother demonstrated she was unwilling to put aside her opinion of the reintegration process for her child's benefit. The fact that Mother interacted well with K.C.M.-E. during sporadic visits, as Mother asserts, is not compelling evidence of the fitness required of a parent.

Given the district court's credibility finding and the substantial evidence of Mother's lack of effort to visit her son, clear and convincing evidence supported the district court's finding that Mother was an unfit parent.

2. *Foreseeable future*

The next issue is whether clear and convincing evidence supported the district court's finding that Mother's conduct or condition was unlikely to change in the foreseeable future. See K.S.A. 2014 Supp. 28-2269(a). An appellate court measures the "foreseeable future" from the child's perspective, considering the child's perception of time. *In re R.S.*, 50 Kan. App. 2d at 1117.

Mother essentially argues her conduct in the few months before the termination hearing demonstrate her unfitness was likely to change in the foreseeable future. Mother points to her new living arrangements, arguing she moved to Wichita to work toward reintegration.

While there is some evidence suggesting Mother's efforts were improving, clear and convincing evidence supported the district court's finding that Mother's conduct or condition rendering her unfit was unlikely to change in the foreseeable future. Mother's employment and living situation were only a part of the reason the district court determined her unfitness was unlikely to change in the foreseeable future. Over the course of a 14-month period, St. Francis tried to work with Mother to reintegrate K.C.M.-E. into her care. But Mother demonstrated a lack of commitment to the process. Her living situation was quite sporadic, and the district court found her testimony concerning employment to be not credible. Moreover, despite more than 51 opportunities to visit her son, Mother only visited K.C.M.-E. on 13 occasions over a 14-month period.

Based on those facts, the district court's finding that the conduct or condition rendering Mother unfit was unlikely to change in the foreseeable future was supported by sufficient evidence.

3. *Best interests*

The last issue is whether the district court correctly found that terminating Mother's parental rights was in K.C.M.-E.'s best interests. See K.S.A. 2014 Supp. 38-2269(g)(1).

In Mother's case, the district court reasonably concluded termination of Mother's parental rights was in K.C.M.-E.'s best interests. The district court noted, by the time of the termination hearing, K.C.M.-E. had lived with Mother for only 8 months and had been outside Mother's home for 14 months. Furthermore, Mother only visited K.C.M.-E. 13 times over a 14-month period. Based on these facts, the district court found K.C.M.-E. likely created more meaningful bonds with his foster family than with Mother.

Considering these findings, we find that the district court did not abuse its discretion in determining it was in K.C.M.-E.'s best interests to terminate Mother's parental rights.

In summary, having considered the evidence presented and the district court's reason for its rulings, we find no error in the court's decision to terminate Father's and Mother's parental rights.

Affirmed.

15