NOT DESIGNATED FOR PUBLICATION

No. 114,996

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

In the Interest of J.T.,
YOB 2007, a Female.

MEMORANDUM OPINION

Appeal from Wyandotte District Court; DANIEL CAHILL, judge. Opinion filed August 19, 2016.
Affirmed.

*Patricia Aylward-Kalb*, of Kansas City, for appellant.

*Ashley Hutton*, assistant district attorney, and *Jerome A. Gorman*, district attorney, for appellee.

Before HILL, P.J., PIERRON and GARDNER, JJ.

*Per Curiam*:  Mother, the natural parent of J.T., appeals from the decision of the district court to terminate her parental rights. Specifically, she maintains there was insufficient evidence to support the district court's findings that she was unfit, that her unfitness was unlikely to change in the foreseeable future, and that termination of her parental rights was in J.T.'s best interests.

On February 3, 2014, the State filed a petition alleging J.T. was a child in need of care (CINC), based on information gathered by the Department for Children and Families (DCF). The State alleged that 6-year-old J.T. had witnessed domestic violence between Mother and Mother's boyfriend on January 17, 2014. Police were called, and Mother was arrested. J.T. said she had been hit in the face by a remote control unit after Mother's boyfriend threw it at Mother. Mother also accused boyfriend of sexually abusing J.T., however, J.T. made no disclosure about abuse and denied being touched sexually.

1

Mother admitted to DCF that she was a methamphetamine user, had used methamphetamine a week prior to the incident, and that J.T. had been present when Mother used the methamphetamine. Mother stated her boyfriend was her methamphetamine dealer and he continued to supply her with the drug. A safety plan provided for J.T. to stay with Mother's foster mother, but Mother violated that plan the same day. On February 6, 2014, the district court granted temporary custody to DCF

At an adjudication hearing on February 19, 2014, Mother appeared and entered a stipulation agreeing that J.T. was a CINC. Father was noted as being deceased. The district court adjudicated J.T. a CINC, finding she was without the care or control necessary for her physical, mental, or emotional health pursuant to K.S.A. 2014 Supp. 38-2202(d)(2). To facilitate reintegration, the court issued interim orders to Mother to (1) obtain/maintain stable, appropriate housing and income; (2) complete psychosocial, substance abuse, and domestic violence assessments and follow recommendations; (3) submit random, negative urinalyses (UAs); (4) complete parenting education, and (5) contact the court service officer (CSO) once per month and/or prior to address changes.

The district court held a disposition hearing on March 27, 2014, and found that reintegration was a viable option. All prior findings and orders remained in effect with one addition: Mother was to complete a mental health assessment and follow all recommendations.

At review hearings on June 20, 2014, and September 17, 2014, the district court ordered all orders to remain in effect. No objections were raised in either proceeding with regards to the recommendations submitted by the CSO's review report. On November 21, 2014, the State filed a motion for termination of parental rights alleging that Mother (1) lacked employment and appropriate housing, (2) had failed to start Level I outpatient treatment or complete a domestic violence assessment, and (3) had failed to complete

2

parenting education. The State acknowledged Mother had demonstrated some progress early in the process, but such progress ceased in May 2014.

On January 16, 2015, Mother filed a motion to continue the termination hearing stating she had secured appropriate temporary housing. She stated a continuance would enable her to gain financial security within 90 days and acquire appropriate permanent housing.

The district court held a permanency hearing on January 20, 2015, and found that reintegration might no longer be a viable goal. The court found Mother was securing housing, although the professionals working with her believed her mental status might prevent reintegration. The court found that either adoption or permanent custodianship might be in the best interests of J.T. The court found good cause existed and granted Mother's motion to continue. A termination hearing was set for April 8, 2015.

On April 8, 2015, the district court held the termination hearing. Mother asked for a continuance due to her inability to get documentation from her doctor concerning her prescription medication causing UA false positives. In denying the continuance as not in the best interests of the child, the court noted that a continuance had been granted previously and this case was now well past the 1-year mark.

The State presented testimony from Sarah Underwood an outpatient therapist at Kaw Valley Center (KVC). Underwood had become involved as a family therapist in February 2015 and conducted an intake session. She stated the therapy goals included strengthening Mother's parenting skills and establishing appropriate boundaries between Mother and J.T. Underwood stated her biggest concern was whether Mother could maintain an appropriate role with J.T. She testified that J.T. assumed the role of parent at times worrying about adult problems. J.T. became anxious when Mother talked about the case. Underwood stated that during her six family sessions, Mother spoke rapidly and

3

displayed tangential thinking, jumping from topic to topic without prompting. Underwood also stated that during Mother's last visit to KVC, her erratic behavior prompted KVC workers to administer a UA test which resulted in a positive reading.

The State next presented testimony from CSO Kristen Gardner. Mother had not kept in regular contact since the inception of the case. Gardner stated Mother contacted her due to a recent positive UA result taken by KVC on March 20, 2015, when she tested positive for marijuana with a faint trace of methamphetamine. Mother believed an anxiety disorder prescription for hydroxyzine caused a false positive UA reading. Gardner stated she twice advised Mother to get a letter from her doctor stating that her prescription drug might cause false positive UA results. Mother also stated the doctor had told her that she could take a larger dosage than prescribed. Three days after the positive UA test, Mother submitted another UA to KVC with negative results. Gardner stated that although the original February 2014 court order required a domestic violence assessment, Mother did not begin the assessment until December 2014. Gardner also testified Mother did not begin the Safe Kids program, the substance abuse assessment, or the mental health assessment until March 2015. Gardner recommended termination of parental rights.

After hearing the first two witnesses, the district court held a chambers conference with council to discuss the direction the case was heading. Following the conference, councel from both parties conferred with the various case workers and when the proceedings resumed the State asked for a 3-month continuance (1) to allow Mother to obtain a note from her doctor describing how her medication might affect UA testing; (2) to allow Mother to explore with her doctor alternative medications which do not affect UA testing; (3) to allow Mother to acquire appropriate permanent housing following her move from temporary housing; (4) to give Underwood more time to assess J.T. in therapy, and (5) to give Cynthia Moses, a therapist at Transitions, whose report had not

4

yet been admitted into evidence, more time to evaluate Mother and update her report. The guardian ad litem joined the State's request for a 3-month continuance.

Mother did not object to the continuance and asked the district court to authorize Transitions, instead of KVC, to provide therapy and visitation services for her and J.T. Mother stated she believed differences in opinion and purpose between her and the KVC staff might have negatively impacted the situation. The court granted the continuance finding it in the best interests of J.T. The court encouraged Mother to be proactive in complying with its orders. The court directed Mother to obtain the following information from her doctor: (1) what medication was prescribed, (2) the correct dosage to administer, (3) if the doctor knew of her substance abuse history, and (4) whether the prescribed medication could cause false positive UA tests. The court declined to transfer services from KVC to Transitions. The court recognized progress had been made in therapy thus far and expressed confidence in KVC and the KVC therapists to work appropriately with clients despite any personal disagreements.

The case was reset for hearing on the motion to terminate for June 26, 2015. In June, the district court again continued the case and set a hearing date for August 12, 2015.

On August 12, 2015, the district court resumed the hearing but stated it understood "it wasn't going to be prepared for today's date." The court acknowledged that one witness would be unavailable in the future so her testimony was taken. Mother placed two exhibits into evidence: (1) a counseling report from Transitions, and (2) a drug and alcohol group completion certificate. The State asked and the court accepted judicial notice of two cases for evidentiary purposes.

The State presented testimony from the KVC case manager, Lindsey Sharp. She testified she had managed the case since February 3, 2014. She had overseen probably

5

twenty or thirty 1-hour visitations between Mother and J.T. The visitations between May 2014 and September 2014 had been either monitored or unsupervised. Sharp testified that on October 3, 2014, the visitations reverted to supervised sessions due to Mother's lack of progress in complying with court orders and due to her erratic behavior during visitations. During one visitation Mother stated that when she was pregnant she used to "go to the club and drop it like it's hot." Sharp testified Mother scared J.T. by discussing aliens during visitation. Sharp counseled Mother on how to appropriately frame topics to protect J.T.

Sharp testified Mother worked as a home health aide for the Coalition for Independence. Mother's natural mother was her patient. The natural mother's apartment had bedbugs. Mother not only worked at the apartment she also occasionally lived there. KVC required Mother to get a doctor's note stating she did not have new bedbug bites. KVC also required Mother to get a note stating an exterminator had treated the apartment. KVC required the notes because visitations occurred in rooms where hundreds of families used the couches and other families and KVC workers had gotten bedbugs. J.T.'s placement family had reported getting bedbugs multiple times. Mother told Sharp on multiple occasions that she had a note from the exterminator but then later said she did not. Mother told Sharp she had left the doctor's note at her natural mother's apartment. Mother stated her natural mother was a hoarder, the apartment required cleaning, and now that the apartment had been cleaned, the exterminator needed to exterminate.

Sharp also testified Mother did not have safe, stable housing as of the hearing date. Mother owed a large amount of money to the city utilities and would not be able to put utilities in her own name. For the majority of this case, KVC did not know where Mother was residing due to her constant moving around. Sharp stated she understood Mother had resided at Hillcrest Transitional Housing for 90 days. When the 90 days ended around April 22, 2015, Hillcrest allowed Mother to stay until May 1, 2015.

Sharp testified Mother did not notify KVC of new housing arrangements, but Sharp had read in a Transitions report that Mother had lived with her natural mother from May 2015 to August 2015. Sharp stated Mother's residing with her natural mother placed natural mother at risk of eviction for violating Section 8 policy. The natural mother's parental rights had been terminated when Mother was a child. Mother had notified Sharp around July 31, 2015, that she had been living with a friend since leaving Hillcrest. Sharp stated she did not consider this stable, appropriate housing for J.T. because Mother's friend had lost parental rights to two children, had prior drug charges, and continued to smoke marijuana. Mother stated the friend would not use drugs around J.T. and would stop using drugs when J.T. came home.

Sharp testified Mother did not have a stable income as of the trial date. On July 31, 2015, Mother notified Sharp that she had quit her home health aide job because her natural mother's apartment had bedbugs.

Sharp stated Mother tested positive on February 20, 2015, for methamphetamine and amphetamines and on March 6, 2015, for methamphetamine and THC. KVC personnel specifically directed UA tests on those dates due to Mother's strange behavior during visitation. Sharp directed a third UA be taken on March 20, 2015, because of Mother's behavior, but that test was invalid due to an insufficient volume of urine. Sharp stated Mother had completed a drug and alcohol program on June 24, 2015, according to a Transition's certificate of completion she had provided to KVC. However, Sharp testified she had informed Cynthia Moses at Transitions that Mother had been a no-show for subsequent UAs on June 30, 2015, and August 10, 2015.

Sharp also testified Mother had complied with some court orders through Transitions. She had completed a domestic violence assessment, was enrolled in Safe Kids, and had received individual therapy with Moses.

7

Finally, Sharp testified Mother was making some progress in her mental health issues with respect to her own needs but was not making significant progress in providing J.T. a safe environment. Sharp believed Mother had received sufficient time to complete the district court's orders and it would be injurious to J.T. to continue the relationship. Mother believed there was no reason why J.T. should be in DCF custody. Sharp's main concerns about reintegration included Mother's mental health and suspected drug use. Mother habitually blamed others for things not being completed. Mother blamed Sharp for not conducting visitations as Mother preferred, for purposely denying visitations, or for her failure to provide KVC with requested documentation. Sharp stated J.T.'s actions were "parentified": (1) during visitation, J.T. often told Mother what was or was not appropriate to do or say; and (2) during placement J.T. often bossed the other children around or became physically or verbally aggressive. Sharp testified it was in the best interests of J.T. to terminate Mother's parental rights.

The district court took no additional testimony and bifurcated the trial to continue on October 5, 2015. The court reiterated the standing order for Mother to provide a doctor's note describing whether her prescribed medication could create a false positive UA result and what the doctor knew of her substance abuse history. The court also ordered Mother to get a doctor's note stating she had no fresh bedbug bites and not to visit her natural mother's apartment until it was cleared of bedbugs. Mother requested that therapeutic visitations be moved to Transitions because KVC would not conduct visitations without proof the bedbug issue had been resolved. The court did not change visitations with KVC to Transitions. However, the court directed Transitions to supervise every other visit for the next 3 weeks to allow Transitions therapists to observe interactions between Mother and J.T.

On October 5, 2015, the district court resumed the proceeding and the State called Taylor Todd, a KVC family support worker. Todd stated Mother had a problem maintaining income and the last pay stub she submitted was on March 31, 2015. Mother

8

still did not have stable housing. On May 29, 2015, Mother reported she had an apartment and would move in on June 1, 2015, but she never provided a copy of the lease. She reported on June 19, 2015, that she would be living with a friend. Todd told Mother this would not be acceptable housing because the friend had criminal drug charges. Todd stated Mother knew she could not live with her natural mother because of previous allegations of physical and sexual abuse. Mother never notified Todd of her intent to apply for subsidized housing. Todd stated he first learned about Mother's desire to obtain housing through the Kansas Crime Victims Compensation Fund after reading a report from Transitions.

Todd stated he directed Mother to provide several UA samples because of her erratic behavior during visitations. Todd testified Mother did not complete another RADAC assessment after testing positive. At one visit, Mother showed J.T. a video of a car crash. When J.T. said the video was getting gross, Mother said, "No, it's not getting gross." J.T. told Mother that she was too young to be watching that video, and Mother said, "You're right. This is getting inappropriate." Todd stated Mother slurred her words and cursed someone over the phone during that same visit. Todd directed Mother to submit a UA sample which came back positive for methamphetamine. Todd stated Mother told him her medications caused the false positives and that "meth doesn't exist on the street anymore. It hasn't even been around for fifteen years. People in Wyandotte County don't use it." The district court interjected at this point admonishing Mother to stop talking during testimony or using stage whispers to deny testimony.

Todd testified that during the March 6, 2015, visitation Mother made groaning sounds and blurted out in a loud voice that court was in 14 days. It was actually 33 days away. Her speech was slurred and she talked about her natural mother deleting things from Mother's phone. When J.T. read a joke out loud, Mother repeated several times, "That joke is stupid as hell." Todd directed Mother to submit a UA sample. Mother said

9

she was not expecting a UA because she had one the week before. That UA sample tested positive for methamphetamine.

Todd stated he requested another UA test during the March 20, 2015, visitation. Mother appeared for the visitation unkempt and had slurred speech. Mother moved from lying on the couch to lying on her stomach on the floor. When she accompanied J.T. to the lunchroom, Mother appeared to lose her balance and fell over the table. She picked up a cherry tomato, put it in her mouth, chewed it, and then spit it out into her own jacket. Todd directed Mother to provide a UA sample, but the test came back invalid due to an insufficient volume of urine to test.

Todd testified that during the May 8, 2015, visitation, Mother slurred her words, appeared unkempt, and had dilated pupils. She showed Todd an application on her phone requiring her to feed an electronic pet or the pet would become sad. After showing Todd the application, Mother stated, "See, look. And you guys think I'm on drugs."

Todd stated Mother was to submit a UA sample on June 26, 2015, and bring documentation from her doctor about her medication. She failed to appear that day. Todd testified Mother also failed to appear for UA testing on June 29, 30, and August 10, 2015.

Todd testified Mother completed a mental health assessment on May 20, 2014, but later she told her case manager that the "results were inconclusive" because she was high during the assessment. Part of the mental health assessment included documentation for medication prescribed for Mother. The report stated bupropion had been prescribed for depression and cravings. Mother stated she was taking bupropion, amoxicillin, and hydroxyzine when she tested positive on February 20, 2015. Following her positive UA samples and the court order, Mother never provided any documentation about medication causing false positives.

Todd stated Mother completed domestic violence and Safe Kids assessments with Transitions, but she did not complete another mental health assessment. Although the original petition dated February 3, 2015, reported domestic violence issues between Mother and her ex-boyfriend, she did not complete the domestic violence assessment until January 5, 2015. Mother completed all hours of an age-appropriate parenting class, but the instructor noted Mother had fallen asleep during one of the classes. Mother was attending individual therapy, and she had completed drug and alcohol counseling in July 2015. Todd testified that during and following the Transitions drug and alcohol assessment, Mother missed several KVC directed UA tests. Because a missed UA is considered positive, it was appropriate for Mother to continue drug and alcohol counseling.

Todd testified Mother's behavior during visitations impeded progress and required supervised visitations. During the November 7, 2014, visitation, Mother stated aliens were really people from the future and traveled through a star at the speed of light. She also stated the number of missing children had decreased because babies have GPS tracking devices inserted at birth. During the April 10, 2015, visitation Mother asked J.T. to marry her. When J.T. responded, "No," Mother asked, "What's standing in our way? The law." When J.T. again said, "No," Mother stated "That's crap." During the May 15, 2015, visitation, Mother told J.T., "I'm going to get a big house and five dogs, and let them poop all over it. And I don't care what people think. People would call us dog poop because we would smell so much like dog poop." Mother then took off her skirt, put it on her head, and sat in the lobby waiting for family therapy to start.

Todd stated that during the July 17, 2015, visitation, Mother showed him some bedbug bites on her stomach and legs that she had received at her natural mother's apartment. Todd continued the visitation outside and told Mother she needed to provide a doctor's letter stating she no longer had fresh bedbug bites and she needed to provide an exterminator's letter verifying treatment of the apartment. Visitations were stopped until

11

Mother had provided documentation. On August 19, 2015, Mother brought in a handwritten note on the back of a half of a sheet of paper. The note stated she had been seen at a clinic on August 19, 2015, and that no insect bites had been on her person. "Insect" had been spelled incorrectly. Todd stated he could not verify with the clinic the identity of the person who signed the paper. He told Mother on August 25, 2015, she would need to provide another doctor's note. On September 16, 2015, Mother sent by fax a typed noted from the KU Care Clinic stating she did not have any fresh bedbug bites.

Todd expressed concern about Mother's mental capacity. She failed to appreciate the impropriety of exposing J.T. to drug use, continued to express a belief that J.T. had been sexually abused, and believed that both he and Sharp were out to get her. Todd believed termination of parental rights was in J.T.'s best interests because Mother had failed to maintain stable housing or income for at least 8 months, failed several UAs, and continued to exhibit mental health issues. Todd also expressed concern that the Transition report had diagnosed Mother as severely bipolar, but it failed to mention any treatment plan. On cross-examination, Todd testified that Mother and J.T. did have a bond, but sometimes the bond between Mother and J.T. was inappropriate.

The State next called Transitions counselor, Cynthia Moses. Moses testified she had conducted initial parenting, mental health, and domestic violence assessments, which she stated constitute a Safe Kids assessment. Mother subsequently decided to restart the Safe Kids program because she believed she needed to redo the commitment and accountability sections. After restarting the program Mother had missed the maximum sessions allowable with 10 to 15 sessions remaining.

Moses stated Mother had a lengthy traumatic history that created a great deal of obstacles for her to overcome. Mother had dealt with multiple traumas before she entered the foster care system herself and while in the foster care system. Mother had experienced mental health issues since age 11. Moses stated Mother's erratic behaviors

were due to anxiety related to PTSD. She had seen Mother with J.T. for about 3 hours. Moses stated Mother sought to meet the needs of her natural mother rather than meeting the needs of J.T. due to guilt issues associated with Mother's relationship with her natural mother.

Moses stated Mother was retraumatized in February 2015, when her ex-boyfriend found her living in transitional housing and beat her up. Mother was frightened it might happen again. Mother had no permanent residence, but moved between her aunt's home and a friend's home. Moses told Mother the friend's home was not the best place to reside after Mother told Moses the friend had lost her parental rights and had a drug conviction. Mother's response was, "Well, that's where I'm living now." Moses did not recommend termination because she had seen a very good bond between Mother and J.T., had seen progress individually in Mother, and believed that once Mother found acceptable housing that reintegration could occur within 60 to 90 days.

The State rested after Moses completed her testimony. The guardian ad litem called no witnesses, and Mother requested bifurcation to have her witnesses testify. The district court set the date for November 6, 2015. The court also reminded Mother that two hearings ago, it had reminded her to produce documentation from her doctor to confirm whether her medication could produce false positive UA test results.

On November 6, 2015, the State recalled Sarah Underwood of KVC. Underwood testified that visitations with Mother and J.T. were becoming difficult for J.T. One week J.T. would express a desire to go home with Mother, and the next week she would state the opposite. Although Mother had a better understanding of boundaries, Underwood still had to intervene when Mother acted inappropriately. During family therapy Mother discussed the court case, her case manager, the child welfare system, and said J.T. should not be in foster care. Underwood testified sometimes Mother displayed paranoid thinking by stating that J.T. had been abused. Mother also said she had seen an angel halo over

13

Moses when Moses had testified at the last hearing. When Mother told Underwood it was a message from God, Underwood replied she thought it was delusional thinking. When the State asked Underwood if Mother really thought she saw a halo, Mother interrupted the proceedings by stating, "Who says I didn't?"

Underwood stated Mother had made parenting skill improvements, but she acknowledged she would not be comfortable recommending reintegration at this time. She had only seen Mother and J.T. in an office setting and typically she would make a reintegration recommendation only after seeing them after in-home therapy had begun. Progression to in-home therapy had not occurred due to Mother's inability to find acceptable housing. During cross-examination, Underwood testified permanency would be beneficial for J.T.'s mental health. Not terminating Mother's parental rights would only be helpful to J.T. if reintegration were guaranteed.

Mother testified that at the time of the trial she did not have a home. She believed she could find a home to reintegrate into within 2 months. She had been prescribed a new antidepressant, but she did not remember the medication's name nor could she find it the morning of the trial. Mother stated she "fell off her meds for a little bit recently because of being under stress." She currently resided with her friend who had also had her parental rights terminated. Mother testified she believed J.T. had been abused for the previous 6 years by her ex-boyfriend. She did not know Transitions had diagnosed her with PTSD, severe and complex bipolar disorder by history, and borderline personality disorder.

The district court found Mother's lack of permanent housing a symptom of the major issue. The court found Mother suffered from a mental illness and the duration and nature of the illness rendered her unable to care for the ongoing needs of J.T. The court acknowledged that Mother had made progress, was no longer using drugs, and had insight into how her mental illness affected her ability to parent J.T. However, the court

found that despite Mother's progress, it would not be emotionally healthy and safe for J.T. to forestall termination.

In concluding that Mother's mental illness precluded reintegration within a couple of months, the court cited the following concerns: (1) From the start of this case, during almost every hearing, Mother had assured the court she had a concrete plan to acquire housing that never materialized and (2) her chaotic thinking including the hallucinations about halos and her insistence, without proof, that J.T. had been sexually abused.

The district court found Mother had failed to carry out the reasonable plan designed towards the reintegration of J.T. into a parental home. The court stated KVC had done its job well and found no evidence that KVC had precluded Mother from succeeding. The court also stated Transitions had gone above and beyond to provide for Mother, but despite her progress in caring for herself, she lacked progress in caring for J.T. The court found reintegration was no longer a viable alternative. The court terminated Mother's parental rights as in the best interests of the physical and emotional needs of J.T.

Mother appeals.

On appeal, Mother argues there was insufficient evidence in the record to support the district court's ruling terminating her parental rights. Specifically, she contends there was insufficient evidence to support the court's finding that she was unfit, that her unfitness was unlikely to change in the foreseeable future, and that termination of her parental rights was in J.T.'s best interests.

In reviewing a district court's decision terminating parental rights, an appellate court must consider "whether, after review of all the evidence, viewed in the light most favorable to the State, it is convinced that a rational factfinder could have found it highly

15

probable, *i.e.*, by clear and convincing evidence that [the parent's rights should be terminated.]" *In re B.D.-Y.*, 286 Kan. 686, 705, 187 P.3d 594 (2008). Clear and convincing evidence is "an intermediate standard of proof between a preponderance of the evidence and beyond a reasonable doubt." 286 Kan. at 691. Appellate courts do not reweigh the evidence, judge the credibility of witnesses, or redetermine questions of fact. 286 Kan. at 705.

Before terminating parental rights, the district court must find that the moving party has proven three elements by clear and convincing evidence: (1) The parent is unfit; (2) the conduct or condition which renders the parent unfit is unlikely to change in the foreseeable future; and (3) termination of parental rights is in the best interests of the child. K.S.A. 2014 Supp. 38-2269(a), (g)(1). K.S.A. 2014 Supp. 38-2269(b) and (c) provide a nonexclusive list of factors that the court must consider when determining parental unfitness. The existence of any one of these statutory factors "standing alone may, but does not necessarily, establish grounds for termination of parental rights." K.S.A. 2014 Supp. 38-2269(f).

In the present case, the district court relied upon the following statutory factors in deciding that Mother was unfit, that the conduct or condition rendering her unfit was unlikely to change in the foreseeable future, and that terminating Mother's parental rights was in J.T.'s best interests:

- K.S.A. 2014 Supp. 38-2269(b)(1) (emotional illness, mental illness of such duration and nature as to render the parent unable to care for the ongoing physical, mental, and emotional needs of the child).
- K.S.A. 2014 Supp. 38-2269(b)(7) (failure of social service agency efforts to rehabilitate the family).
- K.S.A. 2014 Supp. 338-2269(c)(3) (failure of a reasonable court-approved plan to get child into parent's home).

16

First, we must determine whether clear and convincing evidence supported the district court's finding of unfitness. Mother contends the court should have delayed termination and provided Transitions, rather than KVC, the opportunity to supervise visitation and therapy. She argues the actions of KVC prevented rather than facilitated reintegration. She contends she complied with all court orders and provided uncontroverted evidence of her ability to obtain housing. Mother also argues she presented no danger toward J.T. nor would a 2-month delay to obtain housing prove injurious to J.T.

The only statutory basis for termination Mother specifically addresses is the failure of social service agencies to rehabilitate the family. K.S.A. 2014 Supp. 38-2269(b)(7) provides that when determining the fitness of a parent, one of the factors the court may consider is the "failure of reasonable efforts made by appropriate public or private agencies to rehabilitate the family." This imposes an obligation on the relevant agencies to expend reasonable efforts towards reintegrating the child with the parents by correcting the conduct and condition that resulted in the removal of the child. See K.S.A. 2014 Supp. 38-2201(b)(8) (citing as a goal of the code the provision of "preventative and rehabilitation services, when appropriate, to abused and neglected children and their families so, if possible, families can remain together without further threat to the children"). The statutes governing unfitness determination, however, do not require proof that the appropriate agencies made herculean effort to lead the parent through the responsibilities of the reintegration plan. See *In re B.T.*, No. 112,137, 2015 WL 1125289, at *8 (Kan. App.) (unpublished opinion), *rev. denied* 304 Kan. __ (2015).

Mother's original case plan included the following tasks:  maintain stable, appropriate housing; maintain stable income; sign all necessary releases; contact the CSO monthly and prior to address or phone change; visitation at the discretion of KVC; complete a psychosocial assessment and follow recommendations; submit to random

17

UAs; complete a substance abuse assessment and follow recommendations; complete domestic violence assessments and follow recommendations; and complete parenting education. Subsequently, on March 27, 2014, the district court ordered Mother to complete a mental health assessment and follow all recommendations. On April 8, 2015, the court also directed Mother to obtain the following information from her doctor: (1) what medication was prescribed, (2) the correct dosage to be administered, (3) if the doctor knew of Mother's substance abuse history, and (4) whether the prescribed medication could cause false positive UA tests. Finally, on August 12, 2015, the court ordered Mother to get a doctor's note stating she had no fresh bedbug bites and she was not to visit her natural mother's apartment until it was cleared of bedbugs.

The record reveals both KVC and Transitions provided multiple services in an effort to rehabilitate the family. Mother did not object to the CSO's reports submitted on June 20, 2014, and September 17, 2014. By November 21, 2014, KVC reported Mother had failed to start Level I outpatient treatment or complete a domestic violence assessment and had failed to complete parenting education. On April 8, 2015, Mother asked the court to authorize Transitions to provide therapy and visitation services rather than KVC. She believed differences with the KVC staff negatively affected the situation. The court declined to transfer services. The court expressed confidence in KVC and the KVC therapists to work appropriately with clients despite any personal disagreements.

On August 12, 2015, KVC personnel acknowledged Mother had completed a domestic violence assessment, was enrolled in Safe Kids, and was receiving individual therapy from Transitions. Again, Mother asked the court to authorize therapeutic visitations be moved to Transitions because KVC would not conduct visitations without proof she did not have new bedbug bites. The court directed Transitions to supervise every other visit for the next 3 weeks. Based on this evidence, the court could conclude that both KVC and Transitions did their jobs well.

18

Mother failed to challenge the district court's statutory findings concerning her emotional illness, and mental illness of such duration and nature rendering her unable to care for the ongoing physical, mental, and emotional needs of J.T.

The record reveals both KVC and Transitions provided therapy services. Transitions therapist Moses stated Mother had a lengthy traumatic history. Mother had experienced mental health issues since she was 11 years old and had dealt with multiple traumas before she entered the foster care system herself and while in the foster care system. Moses stated Mother did not get the mental health treatment she should have while in the foster care system. Mother had been retraumatized in mid-February 2015, when her ex-boyfriend found her living in transitional housing and beat her up. Moses also testified Mother sought to meet the needs of her natural mother rather than meeting the needs of J.T.

KVC therapist Underwood testified Mother displayed paranoid thinking. She continued to believe that J.T. had been sexually abused for years despite J.T. never disclosing any inappropriate contact and a lack of any supporting evidence. Underwood stated Mother exhibited delusional thinking when she told Underwood that seeing a halo over Moses when Moses testified was a message from God. Todd testified Mother displayed delusional thinking when stating Underwood and Todd were personally out to get her.

Mother testified she was surprised to learn that the Transitions therapist diagnosed her with PTSD, severe and complex bipolar disorder by history, and borderline personality disorder. Mother stated she "briefly fell off my meds for a little bit recently because of being under stress." Based on this evidence, the district court could conclude that Mother suffered from a mental illness and the duration and nature of the illness rendered her unable to care for the ongoing needs of J.T.

19

Mother also failed to challenge the district court's statutory findings concerning the failure of a reasonable court-approved plan to reintegrate J.T. into her home. Mother did not have appropriate housing nor did she maintain steady income. The court stated Mother's inability to acquire appropriate housing was a symptom of the major issue. The court noted Mother had often assured the court a solid plan existed to acquire housing, but nothing ever materialized. The court stated this failure to follow through included the status of an application to the crime victims' compensation fund. Mother testified she did not have a home at the time of the trial. Based on this evidence, the district court could conclude that Mother had failed to complete a reasonable court-approved plan.

Second, we must determine whether clear and convincing evidence supported the district court's finding that Mother's unfitness was unlikely to change in the foreseeable future. See K.S.A. 2014 Supp. 38-2269(a). A court may predict a parent's future unfitness based on his or her past history. *In re Price*, 7 Kan. App. 2d 477, 483, 644 P.2d 467 (1982). The term foreseeable future is measured from the child's perspective and takes into account a child's perception of time. *In re S.D.*, 41 Kan. App. 2d 780, 790, 204 P.3d 1182 (2009). This court has considered periods of time as short as 7 months to be the foreseeable future from a child's perspective. 41 Kan. App. 2d at 790.

Mother challenged this statutory finding indirectly by asserting that she would be able to obtain appropriate housing in 2 months. The district court explained that failure to acquire housing was a symptom of Mother's emotional and mental illness. The court stated this was not an easy case but noted that despite Mother's assurance during almost every hearing that she had a concrete plan for housing, it never materialized. The court noted the diagnosis of PTSD, severe and complex bipolar disorder by history, and borderline personality disorder provided uncontroverted evidence that Mother suffered from an emotional illness, a mental disease. The court found the duration and nature of the emotional and mental illness rendered Mother incapable of proving for J.T.'s ongoing needs. The court recognized the progress made by Mother in caring for herself but noted

20

the illness still impeded Mother's ability to get housing and gain steady employment. The illness also manifested itself via thinking errors such as claiming J.T. had been sexually abused or claiming she had seen a halo over Moses. Based on this evidence, the district court could conclude that it was highly probable that Mother would be unable to care for J.T.'s physical, mental, and emotional needs in the foreseeable future.

Our last consideration is whether the district court correctly determined that terminating Mother's parental rights was in J.T.'s best interests. K.S.A. 2014 Supp. 38-2269(g)(1) provides that even after a finding of unfitness, the district court must determine whether termination of parental rights is in the best interests of the child.

The district court is in the best position to determine the best interests of the child because it hears the evidence directly, and the appellate court cannot overturn it without finding an abuse of discretion. See *In re Marriage of Rayman*, 273 Kan. 996, 999, 47 P.3d 413 (2002); *In re K.P.*, 44 Kan. App. 2d 316, 322, 235 P.3d 1255, *rev. denied* 291 Kan. __ (2010). An abuse of discretion occurs when the district court bases its decision on an error of fact or law, or when no reasonable person would agree with the decision of the district court. *Northern Natural Gas Co. v. ONEOK Field Services. Co*, 296 Kan. 906, 935, 296 P.3d 1106 (2013).

Mother indirectly challenges this statutory finding by asserting that no evidence was presented showing she was a danger to J.T. nor did evidence establish that a short delay would be dangerous to J.T. The district court found that although Mother had made great strides in caring for herself, she still lacked the ability to care for J.T. Her instability in employment and her thinking errors concerning sexual abuse allegations indicated the duration and nature of her mental illness impaired her ability to function. The district court did not abuse its discretion when it concluded that terminating Mother's parental rights was in the best interests of J.T.

21

For all these reasons, when viewed in the light most favorable to the State, there was clear and convincing evidence to support the district court's findings that Mother was unfit, that the conduct or condition that rendered her unfit was unlikely to change in the foreseeable future, and that termination of parental rights was in J.T.'s best interests.

Affirmed.