204 P.3d 1182 (2009)
In the Interest of S.D., a Child Under the Age of 18 Years.
No. 101,596.
Court of Appeals of Kansas.
April 17, 2009.
*1184 Sam S. Kepfield, of Hutchinson, for appellant natural mother.
Michelle Brown, assistant district attorney, Steven L. Opat, district attorney, and Stephen N. Six, attorney general, for appellee.
Before RULON, C.J., GREENE and HILL, JJ.
RULON, C.J.
J.D., the natural mother of S.D., appeals the district court's termination of her parental rights. We conclude that a rational factfinder could have found it highly probable, i.e., by clear and convincing evidence, that mother's parental rights should be terminated and that termination was in the child's best interests. Accordingly, we affirm.

Factual and procedural background
S.D. was taken into protective custody on February 6, 2007, on suspicion she was the victim of physical abuse. That day, mother's live-in boyfriend, A.Q., brought 2 ½-year-old S.D. to the Geary Community Hospital. S.D. had multiple injuries, including a cut lip; injuries to both thighs; an injury to her right leg, which had a shoe print on it; marks on her neck; and what appeared to be belt marks on her back. A.Q. had been taking care of S.D. while mother was at work.
During the ensuing police investigation, both mother and A.Q. initially said they did not know how S.D. was injured. A.Q. claimed the injuries must have happened when he was sleeping. A.Q. suggested perhaps a stack of DVDs had fallen on S.D. and S.D. may have been scratched by their puppies. Upon being shown pictures of S.D.'s injuries, A.Q. began crying and eventually admitted to being responsible for a couple of the injuries, including the marks on S.D.'s back.
When mother was questioned, she told police she had bathed S.D. the night before and did not see any injuries on her. However, mother told police that about 2 weeks prior, mother returned home from work to find A.Q. had handcuffed S.D. to the bed. After police showed mother pictures of S.D.'s injuries, mother began to cry and told police she did not want A.Q. in her home any more. A.Q. was arrested and charged with child abuse.
*1185 Police questioned mother again the next day after they learned not all of S.D.'s injuries had been inflicted recently. Eventually, mother admitted she had lied about bathing S.D. the night before; she hadn't bathed S.D. in days. Mother told officers that A.Q. had been spanking her and S.D. for over a month. Mother told police she was afraid to leave A.Q. because he had threatened to kill her and harm S.D. if she left him. Mother was arrested and charged with aggravated child endangerment and obstruction of official duty.
S.D. was placed in the custody of SRS, which placed S.D. in an out-of-home placement. A hearing was held April 4, 2007, on the State's petition alleging S.D. was a child in need of care. At the hearing, mother stipulated to the allegations of the petition, including S.D. had been physically abused. Thereupon, the district court found S.D. was a child in need of care.
SRS's investigation into the physical abuse led to a substantiated finding of child abuse as to both A.Q. and mother. Mother's substantiated finding was based on failure to protect S.D. from abuse.
On April 16, 2007, mother was convicted of aggravated child endangerment and was sentenced to probation, with one of the conditions being she have no contact with A.Q. A.Q. pled guilty to a reduced charge of attempted child abuse. Although the record is unclear on this point, we understand A.Q. received probation.
Mother's initial case plan goal was reintegration and she was assigned various tasks to complete in order to achieve reintegration. During the first 4 months that S.D. was in custody, mother made very good progress on her case plan tasks. Mother completed a drug and alcohol assessment; completed parenting classes; completed a psychological assessment; submitted to UAs prior to all visits, testing clean on all but one of the first tests; cooperated with social workers; and kept regular visits with S.D. By early June 2007, because of her progress, mother was having unsupervised visits with S.D. and the agency was considering allowing overnight unsupervised visits.
One of the requirements of mother's case plan was she have no contact with A.Q. There was a dual no contact order between S.D. and A.Q., issued by the district court when S.D. was taken into custody. In mid-June 2007, the caseworker received information mother was having contact with A.Q. When asked about contact with A.Q., mother admitted having contact with him about 3 weeks prior. When the caseworker expressed her concern about this, mother replied she believed people could change and she wanted to be in a relationship with A.Q. Mother told the caseworker she would never allow S.D. to be alone with A.Q. We understand when S.D. was taken into custody, mother was pregnant with A.Q.'s child; she gave birth to A.Q., Jr. in September 2007.
The next day, two family support workers went to mother's home for an unannounced visit. Mother delayed letting them in. Once inside, they saw a man, whom mother later admitted was A.Q., leaving out of the back door. Mother's unsupervised visits were terminated, and mother signed a safety plan in which she agreed to not have contact with A.Q. and to contact law enforcement and the agency if A.Q. tried to contact her.
On September 21, 2007, A.Q. escaped from custody (it is not clear from the record why A.Q. was in custody at that time). The investigation led officers to believe A.Q. was staying with mother. However, when police and a caseworker confronted mother about this, mother denied having any contact with A.Q. Eventually, police went to an apartment in Manhattan where they believed A.Q. might be located. Mother was at the apartment. Although mother told police she did not know if A.Q. was in the apartment, he was found hiding under the kitchen sink. Both A.Q. and mother were arrested. Subsequently, mother admitted she had been having ongoing contact with A.Q. When the caseworker asked her why she was having contact with A.Q., mother said he had been threatening and controlling her. Mother told the caseworker she had contact with A.Q. because he wanted to see his new son. Mother told the caseworker she was done with A.Q.; she had decided not to be in a relationship with him for the sake of her children.
*1186 Mother was convicted of three counts of violation of a PFA order and felony obstruction of official duty. Because mother was on felony probation on the aggravated child endangerment conviction at the time of the new offenses, she was sent to prison. Mother's earliest possible release date is May 4, 2009. A.Q. was also sent to prison, and his earliest possible release date is May 23, 2009.
On February 20, 2008, the State filed a motion to terminate mother's parental rights. A trial was held on June 13, 2008. Both mother and A.Q. testified. A.Q. testified he did not abuse S.D., but took the blame so he would go to jail rather than her.
Mother testified she had not been truthful with the police. She said A.Q. had never abused or threatened her and she had lied about the handcuffs incident. She testified she loves A.Q. and would be with him if she could. Although she testified she wanted the no contact order lifted, she said she would abide by it if it was not lifted, as being in prison had taught her the value of complying with court orders. However, during the trial, one of the correctional officers charged with escorting mother and A.Q. saw A.Q. slip a note to mother  a violation of the continuing no contact order. In the note A.Q. professed his love for mother and told her he will come back to Junction City.
Mother had several character witnesses who testified that she loves S.D., is a good mother, and would always place S.D.'s needs before her own.
Other evidence at the hearing showed S.D. has special needs. S.D. suffers from post traumatic stress disorder, has behavioral issues, and her speech is delayed. S.D. is in therapy for her mental health issues and in speech therapy.
The agency caseworker testified she did not believe it would be in S.D.'s best interests to wait until mother is released from prison to again attempt reintegration with mother. She based this opinion on the following facts: At the time of the hearing, S.D. had been in an out-of-home placement for almost 1½ years; S.D. had not had contact with her mother for 9 months because of mother's incarceration and, at the time of the hearing, mother's earliest possible release date was 11 months away. The caseworker testified even if mother is released in May 2009, she would be subject to postrelease supervision and thus would still not be in a position to provide permanency for S.D. in a timely fashion. The caseworker testified any reintegration plan after mother is released would include a no contact order and she doubted, based on mother's past conduct, whether mother would comply with such an order.
At the conclusion of the trial, the district court terminated mother's parental rights to S.D. The court found the State had proved by clear and convincing evidence that mother was unfit by reason of conduct or condition that rendered her unable to properly care for S.D. and such conduct or condition was unlikely to change in the foreseeable future. The district court further found, considering the physical, mental, or emotional health of the child, termination of mother's parental rights was in S.D.'s best interests.
Mother timely appeals.
K.S.A.2008 Supp. 38-2269(a) provides that the district court may terminate parental rights after finding by clear and convincing evidence that "the parent is unfit by reason of conduct or condition which renders the parent unable to care properly for a child and the conduct or condition is unlikely to change in the foreseeable future." Clear and convincing evidence is evidence which shows that the truth of the facts asserted is highly probable. In re B.D.-Y., 286 Kan. 686, Syl. ¶ 3, 187 P.3d 594 (2008). When an appellate court reviews a trial court's determination to terminate parental rights, it considers whether, after review of all the evidence, viewed in the light most favorable to the State, it is convinced that a rational factfinder could have found it highly probable, i.e., by clear and convincing evidence, that the parent's rights should be terminated and such termination was in the child's best interests. In re B.E.Y., 40 Kan.App.2d 842, Syl. ¶ 1, 196 P.3d 439 (2008).
K.S.A.2008 Supp. 38-2269(b) and (c) provide a nonexclusive list of factors the court may consider in determining unfitness and in *1187 terminating parental rights. The existence of any one of the statutory factors "standing alone may, but does not necessarily, establish grounds for termination of parental rights." K.S.A.2008 Supp. 38-2269(f).
The district court based its finding of unfitness on the following statutory factors: K.S.A.2008 Supp. 38-2269(b)(2) (conduct toward a child of a physically, emotionally or sexually cruel or abusive nature); K.S.A.2008 Supp. 38-2269(b)(5) (conviction of a felony and imprisonment); K.S.A.2008 Supp. 38-2269(b)(7) (failure of reasonable efforts by the agency to rehabilitate the family); K.S.A. 2008 Supp. 38-2269(b)(8) (lack of effort by mother to adjust her circumstances, conduct or condition to meet the needs of S.D.); and K.S.A.2008 Supp. 38-2269(c)(3) (failure to carry out a reasonable court-approved plan directed toward reintegrating the child into the home).
The district court found the following facts supported its determination that mother was unfit: S.D. was taken into SRS custody in February 2007, after mother's boyfriend allegedly battered S.D. and mother allegedly knew about the ongoing abuse and failed to protect the child; mother failed to comply with the case plan requirements by not remaining crime free, by violating the terms of her probation, and by having contact with the child's abuser; mother's felony probation was revoked and she was sent to prison; and mother was convicted of new crimes, which caused her to receive an additional sentence of imprisonment.
Mother essentially challenges the sufficiency of the evidence to support the district court's finding of unfitness based upon the statutory factors set out above.
Mother contends the evidence did not support the finding she engaged in conduct toward S.D. of a physically, emotionally, or sexually cruel or abusive nature. See K.S.A. 2008 Supp. 38-2269(b)(2)  conduct toward a child of a physically, emotionally or sexually cruel or abusive nature. In support, she makes two arguments. First, mother suggests her testimony at the trial in which she "cover[ed] up for A.Q." "may be indicative of battered woman syndrome." She asserts some states allow victims of domestic violence to introduce such evidence to explain the failure to protect.
There is no evidence in the record mother suffered from battered woman syndrome  a fact mother's counsel ostensibly recognizes in suggesting the evidence "may" indicate such. There is some evidence in the record mother told others A.Q. had abused her and she was afraid of A.Q. However, mother never argued to the district court that physical abuse by A.Q. should be considered as a defense for the failure to protect S.D. At trial, mother denied that A.Q. had ever abused her. In any event, mother's argument invites this court to reconsider the evidence in a different light  something we will not do. Under our standard of review, we view the evidence in the light most favorable to the State. In re B.D.-Y., 286 Kan. 686, Syl. ¶ 4, 187 P.3d 594. Thus, we do not reweigh the evidence or substitute our judgment for that of the district court. In re M.B., 39 Kan.App.2d 31, 44, 176 P.3d 977 (2008).
Mother also argues K.S.A.2008 Supp. 38-2269(b)(2) requires proof she directly participated in physically abusing S.D. She argues mere inaction, such as the failure to protect a child from abuse, is insufficient.
Mother's argument requires we interpret the meaning of K.S.A.2008 Supp. 38-2269(b)(2). "Interpretation of a statute is a question of law, and the appellate court's review is unlimited." In re T.S., 276 Kan. 282, 287, 74 P.3d 1009 (2003), disapproved of on other grounds, In re B.D.-Y., 286 Kan. 686, 187 P.3d 594.
We note first mother did not raise this argument before the district court. As a general rule, an appellate court will not consider arguments raised for the first time on appeal. In re S.M.H., 33 Kan.App.2d 424, 429, 103 P.3d 976, rev. denied 279 Kan. 1006 (2005). Exceptions to this general rule have been recognized where: (1) The newly asserted theory involves only a question of law arising on proved or admitted facts and which is finally determinative of the case; (2) questions raised for the first time on appeal if consideration of the same is necessary to *1188 serve the ends of justice or to prevent denial of fundamental rights; and (3) the judgment of the trial court may be upheld on appeal although that court may have relied on the wrong ground or assigned a wrong reason for its decision. Smith v. Yell Bell Taxi, Inc., 276 Kan. 305, 311, 75 P.3d 1222 (2003).
We will address this issue under the second exception. Addressing the purely legal issue of whether K.S.A.2008 Supp. 38-2269(b)(2) applies where a parent fails to protect his or her child from abuse serves the interests of justice by providing guidance to the bench and bar. Cf., State v. Miller, 284 Kan. 682, 709, 163 P.3d 267 (2007) (issue raised for the first time on appeal considered because "further discussion" of the issue necessary to serve the ends of justice); State v. Harned, 281 Kan. 1023, 1045, 135 P.3d 1169 (2006) (issue raised for the first time on appeal not novel and therefore addressing it would not serve the ends of justice). Additionally, termination of parental rights implicates a parent's fundamental right to custody and control of his or her children. See In re J.L., 20 Kan.App.2d 665, Syl. ¶ 2, 891 P.2d 1125, rev. denied, 257 Kan. 1092 (1995).
Mother supports her argument with a Texas case that held that a 1 day delay in reporting father's abuse of child was insufficient to support termination of her parental rights. See Shapley v. Texas Department of Human Resources, 581 S.W.2d 250 (Tex.Civ. App.1979). That case is not on point. It does not address whether or not a statute similar in wording to K.S.A.2008 Supp. 38-2269(b)(2) requires actual physical abuse.
Mother further cites a 1995 Family Law Quarterly article for the proposition that terminating an abused mother's parental rights for failure to protect her child imposes "an affirmative legal duty not found in statutory or common law to protect a child from abuse." Davidson, Child Abuse and Domestic Violence: Legal Connections and Controversies, 29 Fam. L.Q. 357, 366 (Summer 1995).
We conclude mother's argument unpersuasive. First, in Kansas, it has been recognized that parents have a natural, as well as common-law, duty to protect their children from abuse. Cf. State v. Edgar, 281 Kan. 47, 68, 127 P.3d 1016 (2006) (quoting 59 Am.Jur.2d, Parent & Child § 22, p. 190) (prosecutor did not commit misconduct by cross-examining defendant about his failure to intervene to stop abuse of his child; parents have a legal duty to protect their children from abuse). Moreover, our criminal statutes impose a duty on parents to protect their children from abuse. K.S.A. 21-3608 (child endangerment); K.S.A. 21-3608a (aggravated child endangerment).
Moving to the language of the statute, we are guided by the fundamental rule of statutory construction: The intent of the legislature governs if that intent can be ascertained. Winnebago Tribe of Nebraska v. Kline, 283 Kan. 64, 77, 150 P.3d 892 (2007). We "ascertain the legislature's intent through the statutory language it employs, giving ordinary words their ordinary meaning." State v. Stallings, 284 Kan. 741, 742, 163 P.3d 1232 (2007).
K.S.A.2008 Supp. 38-2269(b)(2) concerns conduct toward a child of an "abusive nature." The ordinary meaning of the phrase "abusive nature" as opposed to the term "abuse" plainly evidences the intent to cover abusive conduct other than actual direct physical abuse. This reading is bolstered by the language of one of the other statutory factors, K.S.A.2008 Supp. 38-2269(b)(4), which concerns "physical, mental or emotional abuse or neglect or sexual abuse of a child." That subsection plainly applies to direct abuse of a child. See State v. Breedlove, 285 Kan. 1006, 1015, 179 P.3d 1115 (2008) (when construing statutes to determine legislative intent, appellate court must consider various provisions of an act in pari materia). If we were to accept mother's construction, there would be no need for subsection (b)(4), as it would be duplicative of K.S.A.2008 Supp. 38-2269(b)(2).
Last, we note a parent's failure to protect a child from abuse has been found sufficient to support termination of parental rights. See e.g., In re J.D.D., 21 Kan.App.2d 871, 876-77, 908 P.2d 633 (1995).
We hold a parent's failure to protect their child from abuse constitutes "conduct *1189 toward a child of a physically, emotionally or sexually cruel or abusive nature" under K.S.A.2008 Supp. 38-2269(b)(2).
Mother argues the evidence was insufficient to establish mother's incarceration was a valid factor to support termination of mother's parental rights. See K.S.A.2008 Supp. 38-2269(b)(5)-felony conviction and imprisonment. She contends evidence she tried to get pictures of S.D. while incarcerated showed mother had made a reasonable attempt to maintain an ongoing relationship with S.D. Mother argues because she was scheduled to be released in just under 1 year, the evidence was insufficient to support a finding her present inability to care for S.D. was unlikely to change in the foreseeable future. Mother contends it would not be unreasonable to require S.D. to wait that long for reintegration.
We have recognized a parent incarcerated for a long term obviously cannot "provide the customary parental care and guidance ordinarily required." In re M.B., 39 Kan.App.2d 31, Syl. ¶ 10, 176 P.3d 977. In that situation, the court must consider the extent to which the "imprisoned parent has made reasonable attempts to contact and maintain an ongoing relationship" with her child. The sufficiency of those efforts is for the trial court to determine. 39 Kan.App.2d 31, Syl. ¶ 10, 176 P.3d 977.
Here, mother's incarceration on a felony conviction was sufficient to support this factor. Mother's only effort to maintain contact with her child while imprisoned was a request for her picture. There was no evidence of any other efforts on mother's part to attempt to fulfill the customary duties of a parent.
The evidence also supported the district court's finding mother's condition would not change in the foreseeable future. What is the "foreseeable future" is to be considered "from the child's perspective, not the parents', as time perception of a child differs from that of an adult." In re M.B., 39 Kan.App.2d at 45, 176 P.3d 977. At the time of the hearing, mother was not scheduled to be released for 11 more months. We have found incarceration for as few as 7 additional months from the date of the hearing, along with other factors, was sufficient to establish that the parent's condition would not change in the foreseeable future. See In re M.B., 39 Kan.App.2d at 47-48, 176 P.3d 977. See also In re D.T., 30 Kan.App.2d 1172, 1175, 56 P.3d 840 (2002) (under circumstances, which included infrequent contact, it would be unreasonable to require child to wait an additional 10 months for parent's release from prison).
Here, S.D. had already been in out-of-home placement for 7 months when mother was imprisoned. By the time mother is released from prison, S.D. will have been in out-of-home placement for 27 months  almost half of her life. The district court found it especially pertinent mother's incarceration was the direct result of mother's conduct in violating the no contact order put into place to protect S.D. Under the circumstances, we conclude there was sufficient evidence to support the district court's determination mother's incarceration on a felony conviction supported a finding mother was unfit by reason of conduct or condition that was not likely to change in the foreseeable future.
Mother argues reasonable efforts by the agency failed to rehabilitate the family. Mother claims she had completed all of her case plan tasks and was only unable to reintegrate with S.D. because she went to prison. See K.S.A.2008 Supp. 38-2269(b)(8) and (c)(3).
Mother's argument does not account for the seriousness of her failure to comply with the no contact order. The no contact order was a reasonable requirement of the reintegration plan that was intended to protect S.D. from her abuser. It was mother's repeated failure to comply with that order and mother's resulting imprisonment for her conduct that supported the finding that mother had failed to carry out the reintegration plan and that rehabilitation efforts had failed. Considering all of the evidence before the district court in the light most favorable to the State, we conclude the evidence was sufficient to support the district court's finding that rehabilitative efforts had failed and *1190 mother had failed to carry out the reintegration plan.
Briefly stated we conclude the evidence in the record was sufficient to establish mother demonstrated a lack of effort to adjust her circumstances and conduct to meet the needs of her child. See K.S.A.2008 Supp. 38-2269(b)(8).
In summary, considering all the evidence in the record before us, we are convinced by clear and convincing evidence a rational factfinder could have found it highly probable that mother was unfit by reason of conduct or condition that rendered her unable to properly care for S.D. and that conduct or condition was unlikely to change in the foreseeable future. Moreover, in terminating mother's parental rights, the district court found that termination was in S.D.'s best interests, in light of her physical, mental, and emotional needs. Accordingly, we affirm.