NOT DESIGNATED FOR PUBLICATION

No. 120,316

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

In the Interest of A.H.,
A Minor Child.

MEMORANDUM OPINION

Appeal from Wyandotte District Court; DANIEL CAHILL, judge. Opinion filed April 12, 2019. Affirmed.

*Patricia Aylward-Kalb*, of Kansas City, for appellant natural mother.

*SueZanne M. Bishop*, assistant district attorney, and *Mark. A. Dupree Sr.*, district attorney, for appellee.

Before ARNOLD-BURGER, C.J., HILL and BUSER, JJ.

PER CURIAM: In this appeal G.B., the mother of A.H., asks us to reverse the district court order terminating her parental rights to her son, A.H. She attacks the court's ruling in two ways. First, she contends that there was insufficient evidence to prove that she is unfit as a parent and that her unfitness is unlikely to change in the future. She also argues the court improperly decided that it was in her son's best interests to sever her parental rights. Because the record shows that Mother is either unwilling or incapable of coming to grips with her debilitating drug problems, she was never able to provide a safe, supportive home for her son during the time this child in need of care case was pending. She had no home and lived either with relatives or in jail. We agree with the district court—it is in A.H.'s best interests to sever Mother's parental rights.

1

*Mother admits her son is a child in need of care.*

The police took A.H. into protective custody when he was four years old. Adult protective services workers found him in the roach-infested apartment of his 91-year-old grandfather. Grandfather needed adult supervision, and his apartment was no place for a four-year-old boy. After the police took A.H. into custody, the State filed a Child In Need of Care Petition.

In 2017, in response to the State's petition, Mother admitted using drugs. She stipulated to using methamphetamine and marijuana. She acknowledged she was homeless. Mother also disclosed she had been receiving treatment for thyroid cancer and "just got new meds." Mother conveyed she wanted help to get A.H. back in her home.

The court accepted Mother's stipulation and based on her admissions, found that A.H. was without adequate parental care, control, or subsistence, and that the condition was not due solely to the lack of financial means of the child's parents. The court thus adjudicated A.H. a child in need of care and ordered that reintegration with Mother be the case plan goal. To promote this goal, the court ordered Mother to:

- Have visitation at the discretion of Kaw Valley Center;
- have contact once per month with the court services officer;
- notify the court services officer when she changed her address or phone number;
- obtain and maintain stable housing and income, and provide verification of these;
- sign any necessary releases of information;
- participate in a psychosocial evaluation and abide by the recommendations; and
- submit negative, random, and timely UAs at the request of the CSO and KVC; and if there was a positive result, then submit to a drug and alcohol assessment and follow the recommendations.

2

At a review hearing, the court later added three more directions for Mother:

- Participate in a parenting education course and provide proof of completion;

- resolve all of her personal legal matters; and

- complete the recommended substance abuse program and abide by the program's recommendations.

With no real progress being made by Mother toward achieving the goal of reintegration, the court, in May 2018, was forced to change its prior permanency goal from reintegration of the family to adoption. The court ordered a new plan to be submitted with measurable goals, objectives, and time frames to achieve adoption. The court also ordered of all its prior orders to continue.

When the State later filed its motion seeking the termination of Mother's parental rights, it alleged that Mother violated the reintegration plan and failed to adjust her circumstances to meet the needs of her son. In support, while the State acknowledged that Mother had signed all necessary releases, she did little else. After she produced several positive or presumed positive UAs, Mother did complete a drug and alcohol assessment, as well as the psychosocial assessment. But she failed to complete any of the other reintegration tasks ordered by the court.

At the termination hearing, the court heard testimony from the CSO, the KVC case manager, and Mother. The CSO monitored Mother's compliance with the court's orders and testified that she informed Mother of the court's orders whenever she could make contact with her. The CSO also emailed Mother the orders in June 2018. The CSO testified that Mother had not complied with the orders.

The evidence presented at the hearing revealed that Mother did not follow all the recommendations from the psychosocial evaluation in July 2017. Those recommendations included providing random UAs as well as housing and income

3

verification. The psychosocial evaluation recommended a drug and alcohol assessment in its own right. Additionally, the results of the psychosocial evaluation required Mother to complete parenting education and participate in aftercare services and family therapy.

Mother completed a drug and alcohol assessment in January 2018—about six months after her psychosocial evaluation recommended it. The assessment results recommended that Mother complete level one outpatient treatment. Neither the CSO nor the KVC case manager had a report that Mother had complied with this recommendation. Mother testified that she did not attend the recommended outpatient treatment because although she had a car, her tags were expired and she did not want to drive it.

About three weeks before the hearing, the KVC case manager was notified that Mother completed a second drug and alcohol assessment in Missouri but she had not yet completed the program's orientation. Mother was scheduled to attend orientation the day before the termination hearing, but failed to keep that appointment. Mother testified that she was unable to attend this orientation because her mother was in the hospital after she was stabbed by her stepfather.

Mother testified that she believed she had a drug problem. She said she had used no drugs in about one month. She denied that the case was opened because of her drug problem. She also denied that her drug problem contributed to A.H. staying with Grandfather. Mother also denied that her lack of supervision was connected to her drug problem. "And, yes, my drug—drug use may be a problem. I understand that. I know that. But you can't just quit overnight."

The record reveals abundant evidence that Mother continued to abuse drugs not only in 2017 when the case started, but in 2018, as well. KVC's requested UAs increased in frequency after she tested positive for methamphetamine, THC, and amphetamines. Meanwhile, Mother submitted only 4 out of 11 CSO-requested UAs while this case was

pending. On August 31, 2017, Mother tested positive for "meth, benzos, and THC." On January 31, 2018, she tested positive for "THC and meth." Mother disputed that result, but laboratory testing confirmed it. On May 29, 2018, she tested positive for methamphetamine, THC and alcohol. And on August 7, 2018, she tested negative. At the termination hearing itself, the court ordered Mother to submit to a UA. She tested presumptively positive for methamphetamine. Mother disputed the results.

Mother was late to or did not attend several of her supervised visits with A.H. Mother's supervised visitation appointments were once a week for one hour at the KVC office. Over the course of the case, Mother did not make sufficient progress to advance to unsupervised visitation. She was consistently late to visits. The case manager had concerns about Mother's attitude and attentiveness during some visits, and noted one visit where Mother was asleep on the couch. The case manager also noted that Grandfather routinely accompanied Mother to the visits, despite KVC asking her not to bring him. KVC wanted to observe Mother's parenting without Grandfather's influence. Mother did not recall falling asleep during a visit. She claimed that she always showed up, "except for one visitation," when she was in a car accident. "The rest I have made. I may have been late, but I have been there."

Mother did not provide verification of either stable housing or income to the CSO or KVC. During worker/parent meetings, the KVC case manager provided Mother with resources several times to obtain housing and employment in both Kansas and Missouri.

At the hearing, Mother testified that she had just signed a one-year lease for a place to live. She testified she already moved in and would have furniture and adequate clothing for A.H. The KVC case worker was unaware of this lease, even though she spoke with Mother about Mother's employment a few days before the hearing.

Mother could not remember where she was living when the case began. She recalled living with her father, but then she was in jail in Ray County, Missouri, for 90 days, from early September to mid-December 2017. When she was released, she moved in with her aunt. She then missed a visitation appointment in July 2018 because she was in Jackson County, Missouri, jail after being arrested on a warrant. For about one month, she lived with a cousin. Mother revealed the longest she lived in any one place during the case was around six months.

Mother testified she was working for a lawn maintenance company. She had left this position because she was trying to get a job at a retail store. She went back to the lawn business because it allowed for more flexibility to make her appointments. She was trying to get an old job back at a fast food restaurant that she lost when she went to jail, and visited that restaurant before her termination hearing. Mother acknowledged that the longest she held a job during the case was the two months she was at the fast food restaurant—from April to June 2018.

The KVC case manager testified that Mother began participating in parenting education through ACT Raising Safe Kids four weeks earlier. Mother attended the first two classes, but did not attend the second two classes. Mother said she missed the classes because of her mother's hospitalization. She did not provide verification of participating in parenting classes to the CSO.

Mother testified she "had some city tickets and stuff" that she was resolving through drug court in Missouri. She suggested that drug court lasts one year, and she was scheduled to attend orientation the following Wednesday. Mother acknowledged she told the district court at her last hearing that she was entering drug court, but she was delayed because of "problems moving 'cause I've had a lot of problems with getting a place, and just family issues and health issues."

The KVC case manager and CSO were aware of Mother's participation in drug court in Missouri. The CSO testified she received no verification from Mother about resolving any of her legal issues.

The CSO testified that all the recommended services were offered to Mother. Similarly, the KVC case manager did not believe there were any other services KVC could have offered to Mother that would have been more effective in successfully reintegrating son and Mother. The KVC case manager testified that she continued throughout the case to offer resources, assistance, and services to Mother. For example, she got Mother involved with the Safe Kids parenting program. The case manager did not believe Mother took full advantage of the KVC services offered to help her complete the reintegration plan. Mother's progress was "pretty minimal."

Mother did not believe she received the support she should have had:

"[I]t's not as easy as you guys make it seem. And then it's like when I do [ ] what I'm supposed to do, you guys don't acknowledge it, or—like, I'm not saying [the KVC case manager] is a bad worker, nothing like that; but sometimes it's easier for her to pick up her phone or something instead of texting. . . . I don't feel like they've helped me."

Mother testified that when the case began in July 2017, she was going through health issues related to her diagnosis of thyroid cancer. She testified she had her thyroid removed "at some point." Mother also revealed that she was in jail for 90 days in Ray County during the case, which delayed her progress. Mother's plan was to keep a stable job and get transportation.

" 'cause I don't have transportation. And . . . got to come from Missouri to Kansas. You guys don't think about traffic; and the buses, they're not always on time. And just make sure that I'm—I mean, if you guys want, I can do inpatient, like, whatever. I just don't

7

want to lose my son, 'cause I feel like if I lose him, then it's not going to help me in any way.

. . . .

"Like, it's going to make me down-spiral . . . ."

Mother requested additional time to get drug treatment.

At the time of the termination hearing, A.H. was five years old. He had been in out-of-home placement for 14 months. A.H. appeared to be bonded with Mother. During the case, he was diagnosed with ADHD and disruptive mood dysregulation disorder. The KVC case worker testified that even under the best of circumstances, these conditions are difficult for a parent to cope with. She did not believe Mother was capable of coping with A.H. because of concerns with Mother's drug use. The case worker testified that A.H. was "doing really well in placement."

The KVC case manager expressed concerns with Mother's inconsistency, lack of stability, and continued drug and alcohol problem. The CSO testified, "Based on the length of time that this case has been open, I do recommend termination."

When the court ruled on the matter, it acknowledged that Mother loved her son. But the court pointed out that Mother's testimony was inconsistent and lacked credibility. The court noted Mother's attitude and lack of insight and "utter lack of progress throughout this case."

The court found:

- there was clear and convincing evidence to establish Mother engaged in the excessive use of intoxicating liquors or dangerous drugs of such a duration and nature that it rendered her unable to care for the ongoing needs of A.H. under K.S.A. 2018 Supp. 38-2269(b)(3);

8

- reasonable efforts were made by appropriate agencies to rehabilitate the family, which failed, under K.S.A. 2018 Supp. 38-2269(b)(7);
- Mother showed a lack of effort to adjust her circumstances, conduct, or conditions to meet the needs of A.H. under K.S.A. 2018 Supp. 38-2269(b)(8); and
- Mother failed to carry out a reasonable plan approved by the court directed towards reintegration of A.H. into her home under K.S.A. 2018 Supp. 38-2269(c)(3).

Ultimately, the district court found Mother unfit and concluded this was unlikely to change in the foreseeable future. The court found Mother showed no planning or realistic chance that she was going to stay out of jail, keep stable housing, keep a stable job, or stay clean and sober in the next year.

The court went on to find that reintegration was not realistic and concluded that to keep A.H. in state custody simply because of Mother's unfitness would not be fair to him and it was in the child's best interests to terminate Mother's parental rights. The district court then ordered Mother's parental rights terminated.

*Mother raises two issues on appeal.*

In this appeal, Mother contends that
- there was insufficient evidence to find by clear and convincing evidence that she was unfit and that condition was unlikely to change in the foreseeable future; and
- the district court abused its discretion in determining that termination was in the best interests of A.H.

9

The Revised Kansas Code for Care of Children provides that the court may terminate parental rights when a child has been adjudicated a child in need of care. K.S.A. 2018 Supp. 38-2269(a). The statute lists nonexclusive factors the court shall consider in determining unfitness. K.S.A. 2018 Supp. 38-2269(b). The court must also consider a separate list of nonexclusive factors when a child is not in the parent's physical custody. K.S.A. 2018 Supp. 38-2269(c). Any one of the factors in K.S.A. 2018 Supp. 38-2269(b) or (c) may, but does not necessarily, establish grounds for termination of parental rights. K.S.A. 2018 Supp. 38-2269(f).

When we review a district court's termination of parental rights, we consider whether, after review of all the evidence, viewed in the light most favorable to the State, we are convinced that a rational fact-finder could have found it highly probable by clear and convincing evidence, that the parent's right should be terminated. See *In re K.W.*, 45 Kan. App. 2d 353, 354, 246 P.3d 1021 (2011). In making this determination, an appellate court does not weigh conflicting evidence, pass on the credibility of witnesses, or redetermine questions of fact. *In re B.D.-Y.*, 286 Kan. 686, 705, 187 P.3d 594 (2008).

How long it takes to accomplish case goals is important in these cases. Indeed, we are directed to judge the "foreseeable future" from the child's perspective, rather than the parent's, because time perception of a child differs from that of an adult. *In re S.D.*, 41 Kan. App. 2d 780, 790, 204 P.3d 1182 (2009). As the court held in *In re A.A.*, 38 Kan. App. 2d 1100, 1105, 176 P.3d 237 (2008):

> "A parent may be labeled 'unfit' under the law even though he or she loves the child and wants to do the right thing, which may be the case here. But we must judge these cases based mostly upon actions, not intentions, and we must keep in mind that a child deserves to have some final resolution within a time frame that is appropriate from that child's sense of time."

Contrary to Mother's examples of completion of the district court's orders, she has shown no meaningful actions toward meeting the district court's plan. She merely testified about her intentions. Her son was out of her custody for 14 months before the hearing, and our review of the record reveals no real improvement in her condition or environment.

Mother contends that a "mere two weeks before this matter came on for hearing, a case plan hearing was held where the primary goal was reintegration between mother and son." Mother admits that "at the inception of this case things got off to a slow start," and attributes her lack of progress on the case plan to thyroid cancer and a period of incarceration. She argues that between "the last review hearing" and the August 28, 2018, case plan, she made significant progress in following and meeting the expectations in the district court.

But the examples she provides are all based on her own testimony and highlight actions she took after the district court's May 2018, ruling that reintegration was no longer viable and the new case plan goal should be adoption. The record shows Mother signed necessary releases and completed the psychosocial evaluation fairly early in the process. But since that time, she failed to follow through with any of the recommendations from that evaluation. While she did submit to a drug and alcohol assessment, she did not follow through with the treatment recommendation. Months later, she submitted to a second drug and alcohol assessment, but then failed to report to the orientation. She tested presumptively positive for methamphetamine the day of the termination hearing.

A.H. has been out of Mother's custody since July 12, 2017. With this record, there is no way for the district court to predict when Mother will be clean and sober sufficiently to change from supervised to unsupervised visits with A.H., let alone regain custody. Likewise, we too cannot so predict.

Additionally, despite the various places of employment Mother has claimed to work, she has never submitted proof of employment or income to show that she could take care of her son. While she entered a parenting education program around four weeks before the termination hearing, she attended only the first two classes and failed to attend the classes in the two weeks immediately preceding the termination hearing. She was intermittently homeless and sporadically living with relatives or in jail during the case, but within two weeks of her trial, she signed a lease. Yet without proof of a steady job and income, the housing verification provided at trial could not meet the district court's orders and establish a pattern of stability over the previous 14 months—a long time for a young child.

Because there are still major obstacles to reintegration, a rational fact-finder could find it probable that Mother was unfit and that condition was unlikely to change in the foreseeable future. Her failure to engage actively in drug treatment and establish progress in meeting the district court's other requirements of housing, financial, and legal stability block any real progress for Mother. We see no reason to alter the district court's ruling on Mother's unfitness.

We turn now to what is in the best interests of this child. Upon making a finding of unfitness of the parent, "the court shall consider whether termination of parental rights as requested in the petition or motion is in the best interests of the child." K.S.A. 2018 Supp. 38-2269(g)(1). In making such a decision, the court must consider the physical, mental, and emotional needs of the child. K.S.A. 2018 Supp. 38-2269(g)(1). In making the best-interests determination, a court must consider the costs to a child's development by remaining in a continuing impermanent placement:

> "[T]he court must weigh the benefits of permanency for the children without the presence of their parent against the continued presence of the parent and the attendant issues created for the children's lives. In making such a determination, we believe the court must

12

consider the nature and strength of the relationships between children and parent and the trauma that may be caused to the children by termination, weighing these considerations against a further delay in permanency for the children." *In re K.R.*, 43 Kan. App. 2d 891, 904, 233 P.3d 746 (2010).

We review a court's best-interests determination for an abuse of discretion. An abuse of discretion

"occurs when no reasonable person would agree with the district court or the district court premises its decision on a factual or legal error. In determining whether the district court has made a factual error, we review any additional factual findings made in the best-interests determination to see that substantial evidence supports them. [Citation omitted.]" *In re R.S.*, 50 Kan. App. 2d 1105, 1116, 336 P.3d 903 (2014).

Mother contends that the district court abused its discretion in determining that termination of parental rights was in A.H.'s best interests. She argues that no evidence was presented "that A.H. needed protection from his mother or that [Grandfather] was a danger to the welfare of her child." She suggests the district court did not give adequate weight to the evidence she presented that A.H.'s behavior issues began after being abused in foster care and "improperly terminated [her] parental rights . . . without clear and convincing or even legally credible evidence."

Here, the court pointed out that Mother had made no progress on two major issues—drug treatment and a lack of effort to carry out a reasonable plan toward reintegration—and that additional time in the system, given Mother's lack of effort, would not be fair to A.H. The court put it this way:

"[I]t would simply be an exercise in cruelty for me to say to [A.H.], no, no, no . . . you're going to be back with this person [Mother], and you can count on it, and you can wait for it . . . without any sign, not one sign that this Court can hang its hat on that says mom has

gotten to a point where she can address her drug problem, she can take responsibility for her own thing, get these things done she needs to get done."

We note that Mother claims no legal or factual error by the court, but she asks us to reweigh the evidence, which we cannot do. See *In re B.D.-Y.*, 286 Kan. at 705. A reasonable person could agree that termination of parental rights was in A.H.'s best interests. Despite their affection for each other, Mother showed no willingness to take the steps necessary to regain custody of A.H. Mother made only cursory and introductory steps in "fits and starts" during the 14 months this case was pending. Continuing Mother's parental rights would not be in the child's best interests. It would only delay permanency for A.H. We see no abuse of discretion on this point.

Affirmed.