NOT DESIGNATED FOR PUBLICATION

Nos. 124,719
124,720

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

In the Interests of A.S. and S.S.,
Minor Children.

MEMORANDUM OPINION

Appeal from Saline District Court; PATRICK H. THOMPSON, judge. Opinion filed November 23, 2022. Affirmed.

*Charles C. Lindberg*, of Allen and Associates Law, LLC, of Minneapolis, for appellant natural mother.

*Nathan L. Dickey*, assistant county attorney, for appellee.

Before WARNER, P.J., GREEN and HILL, JJ.

PER CURIAM: Children's needs do not stop while parents struggle with their drug addiction. They need a safe and nurturing home while they are still young. Sometimes, a court must decide how long a neglected child must languish in the care and custody of their addicted parents. Weighing the evidence, the court must decide whether an addicted parent will make sufficient progress in time to fulfill their parental responsibilities or continue with their struggles with drugs, leaving their children to grow up in foster care. This is such a case.

This is an appeal of the termination of her parental rights brought by the mother of two children—one born in 2018 and another born in 2019. She claims that there is

1

insufficient evidence to support the district court's finding that she is unfit and the court erred when it concluded that it is in the best interests of the children to terminate her parental rights. Her arguments are not persuasive and we affirm the district court.

*This case history displays continuous drug use by the appellant.*

The record displays a struggle with moments of hope, followed by a plunge back into the abyss. While Mother was pregnant with A.S., she used methamphetamine two to three times a week and marijuana daily. Mother tested positive for both drugs in August 2019 when she gave birth to A.S. at a Salina hospital. Mother's husband is the children's father. He was not present for A.S.'s birth. Mother tried to wake him up when she went into labor but did not succeed, so she had to take an ambulance. A.S. spent her first few days suffering from withdrawal symptoms and had to be transferred to a Wichita hospital for care. Father did not visit A.S. in either hospital. He said he did not have transportation and he had to look after the couple's other child—S.S. (born May 2018). Mother went to the Wichita hospital to visit A.S. but had to be escorted out by security because she was scratching herself, yelling, crying, and crawling down the hallway. Her behavior was likely due to her own drug withdrawal.

Mother's situation was reported to the Kansas Department for Children and Families (DCF). The State petitioned the district court to find that A.S. and S.S. were children in need of care. The State was concerned with Mother's drug use. Additionally, a DCF worker met with Mother and Father (Parents) at their home and noted that they were not well-prepared for A.S.'s arrival—they did not have a car seat, diapers, or formula. The Parents were going to be evicted within a couple of weeks and did not have anywhere to live. The district court adjudicated the children to be in need of care.

St. Francis Ministries handled Parents' case plan. Parents were ordered to complete a number of standard case plan tasks, including:

2

- obtain and maintain appropriate, stable housing;

- obtain and maintain employment;

- complete a drug and alcohol evaluation and follow all recommendations;

- submit to drug testing;

- attend all appointments with St. Francis; and

- attend visitation with the children.

Parents' drug use severely limited their visits with the children for the rest of 2019. St. Francis required Parents to submit three consecutive negative urine tests (UAs) before they could see the children. Two of Mother's UAs tested positive for THC and one of those also tested positive for methamphetamine and amphetamines. Father did not show up during this time. In November, Parents each had their first negative UAs—but they had missed several appointments and also had a few positive UAs. It was not until December 2019 that Parents began consistently providing negative UAs. Mother went to inpatient drug treatment in December 2019.

Once Parents were sober, they were able to begin visits with their children. In February 2020, visits were for four hours at Parents' home. A St. Francis worker monitored the initial visits, but they quickly moved to unsupervised as St. Francis did not have concerns with Mother's or Father's parenting. By the end of the month, the district court authorized St. Francis to advance to overnight visits.

Unfortunately, before overnight visits began, the COVID-19 pandemic led St. Francis to move all visits to Zoom in March 2020. This policy was in effect until May 2020. Visits were scheduled for 30 minutes but sometimes they ended early. A.S. was still a baby and S.S. was just under two years old so it was hard to engage with the children via video. St. Francis monitored some of these visits after developing some

concerns about Father's aggressiveness and cursing. Both Mother and Father testified that the change to video visits was difficult for them and led to them relapsing on substances.

Before resuming in-person visits, St. Francis asked Parents to take hair follicle tests. Mother's June 2020 hair follicle test was positive for methamphetamine and amphetamines. But the UAs she provided between May 2020 and July 2020 were all negative. By the end of July 2020, St. Francis developed concerns that Mother was either using fake urine or someone else's urine to pass UAs. Accordingly, the court ordered Mother to submit to hair follicle testing. Mother did not submit another negative drug test for a year. She either tested positive for methamphetamine or THC, refused the test, or did not show up.

*The State moved to terminate Mother's parental rights to both children.*

The State moved to terminate Mother's parental rights in August 2020. The termination hearing was continued to allow Mother more time to work on the case plan. There are periods of real progress in this record.

Despite her positive drug tests, Mother could continue visiting with the children. Mother did well in the visits and St. Francis did not have concerns about her interactions with the children or her behavior. St. Francis helped by transporting Parents from their home in Lyons to the St. Francis office in Salina. St. Francis would also give gas money to Parents if they found an alternate transport. Several times St. Francis workers went to Parents' residence to pick them up for a visit only to discover that Parents were not there. Because of Parents' sporadic attendance at visits, St. Francis instituted a rule at the beginning of 2021 requiring Parents to confirm visits by noon the day before the visit.

Mother did not attend any of the six visits scheduled in the first two months of 2021 because she did not confirm her attendance. She also missed two of her four visits

4

in March 2021 due to her failure to confirm. During this time, Mother also skipped all but one of her hair follicle tests—which was positive for THC and methamphetamine.

Mother missed only one visit in April. St. Francis arrived at her residence to transport her and Father to the visit but neither answered the door or their phones. Mother did make it to her other two visits that month. At one visit, St. Francis asked Mother to submit a mouth swab drug test and she refused. They asked her again at her next visit in May 2021 for a mouth swab. She again refused, admitting that it would be positive for marijuana. When she submitted a mouth swab later that month, it was positive for THC and methamphetamine. At the end of May 2021, St. Francis suspended visits until Parents could provide three consecutive negative drug tests.

The termination hearing was held in November 2021.

Mother entered inpatient drug treatment in October 2021. After completing the treatment, she moved into an Oxford House. She testified that the last time she used drugs was September 29, 2021. Father completed his own inpatient treatment and lived in a separate Oxford House (men and women cannot live together at the houses). St. Francis approved of the Oxford Houses for placement of the children.

For most of the case, Parents had been staying with Father's father (Grandfather). They moved in with Grandfather after being evicted from their home shortly after A.S.'s birth. There was a time at the end of 2019 where Parents were not living with Grandfather—they reported sleeping either in their car, a shelter, or a motel paid for by their pastor—but they moved back in with Grandfather by the beginning of 2020. When Parents' visits with the children were moved to video calls in the spring of 2020, St. Francis workers did develop some concerns about them staying with Grandfather. Grandfather could be heard in the background of these calls making vulgar comments. St. Francis also received a call from Father's mother who said she heard Grandfather yelling

5

and cursing at Parents and threatening to kick them out of his home. Additionally, there was not sufficient space for the children in the home.

At some point in 2021, Grandfather moved out of his house but Parents remained illegally. Police went to the house in June 2021 and asked Parents to leave but they refused. The landlord got an eviction order granting Parents 30 days to stay in the house. Parents stayed there despite having no working utilities. After this, St. Francis did not have a location for Mother until October 2021 when she moved into the Oxford House.

Mother struggled to obtain and maintain stable employment throughout the case. In the 27-month duration of the case, Mother had three jobs. She worked at a restaurant for less than two months, a hotel for a couple of months, and less than a month before the termination hearing, she got another restaurant job.

The termination hearing was held in the first week of November 2021. Parents' case manager Edna Olivas testified about their progress on completing case plan tasks. Olivas' primary concerns with Mother were her drug use and lack of stable housing and income. Although Mother had a job, a place to live, and had not used drugs for over a month, Olivas believed she failed to show that she could sustain her progress. Mother cycled between periods of sobriety and drug use. Mother admitted that her longest period of sobriety since S.S. had been born was only three months. For Olivas to be confident in Mother's abilities, she wanted Mother to show stability for at least six months.

After hearing all of this, the district court terminated Mother's parental rights. A district court can terminate parental rights "when the court finds by clear and convincing evidence that the parent is unfit by reason of conduct or condition which renders the parent unable to care properly for a child and the conduct or condition is unlikely to change in the foreseeable future." K.S.A. 38-2269(a). After making a finding of unfitness, the court must consider whether the termination is in the best interests of the

child. K.S.A. 38-2269(g)(1). In making this determination, the court must "give primary consideration to the physical, mental and emotional health of the child." K.S.A. 38-2269(g)(1).

*There is sufficient evidence here to support the court's findings.*

Mother views this record in a different light. She argues that the evidence shows that she has overcome her drug challenges. She also argues that she was not given enough time to show that she could maintain her sobriety for the long term. In her view, the district court failed to address the effect of the COVID-19 pandemic on St. Francis' visitation policy and thus denied her an opportunity to show her improvement. For these reasons, she asks us to reverse the district court's findings that she was unfit and that her unfitness was unlikely to change in the foreseeable future.

We do not share Mother's view of this record. She was asked to stay sober, show up for visits with her children, and maintain a job and home. She did none of these tasks consistently. We see episodes of improvement followed by periods of decline. Her case manager said she would have liked to see Mother do these things for at least six months to show that she could sustain her progress. The 27-month duration of this case provided Mother with ample time to achieve this goal. But she failed to do so. Mother only worked for five months at three different jobs during the case. Though she did stay with Grandfather for most of the case, her stays were interrupted by periods where she was essentially homeless. Mother did not start staying at the Oxford House until the month before the termination hearing. Mother also engaged in drug use for a majority of the case and had not maintained sobriety for longer than three months.

Mother's argument about the effect of COVID-19 on her case is unpersuasive. She notes that she was doing well before the pandemic caused St. Francis to change its visitation policy. While COVID-19 did cause St. Francis to suspend in-person visits for a

couple of months, nothing in the record suggests that it interfered with Mother's ability to complete her case plan tasks. Mother provided no testimony that COVID-19 prevented her from searching for a job or appropriate housing. COVID-19 did not prevent Mother from showing up to and participating in her video visits. It did not prevent Mother from communicating with her case team. Most importantly, COVID-19 did not force Mother to use drugs.

This case started in August 2019—before COVID-19 interrupted visits—and Mother did not begin working on her case plan for several months. When she got sober she did do well with the children. But once the pandemic limited her in-person contact with St. Francis, she could not sustain that progress. There was an entire year between August 2020 and August 2021 where Mother failed to submit a single negative drug test or make any progress on her case plan. By this point, both children had been in State custody for a majority of their young lives.

When we review a district court's termination of parental rights, we "'consider whether, after review of all the evidence, viewed in the light most favorable to the State,'" we are "'convinced that a rational factfinder could have found it highly probable, *i.e.*, by clear and convincing evidence, that the parents' right should be terminated.'" *In re K.H.*, 56 Kan. App. 2d 1135, 1139, 444 P.3d 354 (2019). In reviewing a district court's decision based on the clear and convincing evidence standard, an "appellate court does not weigh conflicting evidence, pass on credibility of witnesses, or redetermine questions of fact." *In re B.D.-Y.*, 286 Kan. 686, 705, 187 P.3d 594 (2008). We will not reweigh the evidence found in this record.

When we consider Mother's lack of progress, we acknowledge that overcoming drug dependency takes time. But in determining whether a parent's conduct or condition is likely to change in the foreseeable future, the foreseeable future is to be considered

from the child's perspective, not the parents', as time perception of a child differs from that of an adult. *In re S.D.*, 41 Kan. App. 2d 780, Syl. ¶ 9, 204 P.3d 1182 (2009).

Mother wants us to place more weight on her periods of progress than the district court did. This court does not reweigh the evidence. When viewed in the light most favorable to the State, clear and convincing evidence supports the district court's findings that Mother was unfit and her unfitness was unlikely to change in the foreseeable future. Her untimely steps to work on her case plan do not justify reversal of the district court's decision.

*The best interests of these two children are being served by the district court's findings.*

Mother also argues that the district court abused its discretion by failing to adequately consider whether termination of her parental rights was in the children's best interests.

The law requires a district court to determine whether termination of parental rights is in the best interests of a child, giving primary consideration to the physical, mental, and emotional health of the child. K.S.A. 38-2269(g)(1). According to this statute, district courts must "weigh the benefits of permanency for the children without the presence of their parent against the continued presence of the parent and the attendant issues created for the children's lives." *In re K.R.*, 43 Kan. App. 2d 891, Syl. ¶ 7, 233 P.3d 746 (2010).

When a court makes this determination, it should "consider the nature and strength of the relationships between the children and parent and the emotional trauma that may be caused to the children by termination of the parental rights, weighing these considerations against a further delay in permanency for the children." 43 Kan. App. 2d 891, Syl. ¶ 7.

This court has explained this standard of review in terms of reason and evidence:

"If the court makes a finding of unfitness, the court then must determine whether termination of parental rights is in the best interests of the child. The district court's determination in this regard is a discretionary judgment call. On appeal, the appellate court reviews the best-interests determination for abuse of discretion. A district court abuses its discretion when no reasonable person would agree with its decision or the decision is based on a legal or factual error. If the district court makes any additional factual findings that relate solely to the best-interests determination, those findings may be made based on the preponderance of the evidence and are reviewed on appeal to see whether substantial evidence supports them." *In re R.S.*, 50 Kan. App. 2d 1105, Syl. ¶ 2, 336 P.3d 903 (2014).

Mother argues that the district court disregarded the children's needs and instead focused only on Parents' actions. She asserts that the district court "made no findings whatsoever as to why it was in the children's best interest to have their parents['] rights terminated." Mother says the district court should have considered that the children would suffer emotional trauma if it terminated her parental rights and weighed that against the damage caused by another delay in permanency.

It is true that the district court made very brief findings about the best interests of the children. It noted only that Mother lacked a connection with the children before finding that termination would serve their physical, mental, and emotional needs.

Litigants must generally object to a district court's failure to make adequate factual findings to give the district court an opportunity to correct any alleged errors. "Without an objection, this court will presume the district court made all the necessary factual findings to support its judgment, though this court may consider a remand if the lack of specific findings precludes meaningful appellate review." *Bicknell v. Kansas Dept. of Revenue*, 315 Kan. 451, Syl. ¶ 14, 509 P.3d 1211 (2022).

10

Our appellate review here is not precluded by the district court's minimal findings. The court's decision was a discretionary one which could be reversed only if no reasonable person would agree with it. Mother had not visited the children for months before the termination hearing. Before that, her visits were inconsistent. She missed many simply by failing to call and confirm with St. Francis that she was available. A.S. never lived with Mother, and S.S. spent a majority of his life away from Mother. Based on Mother's lack of connection with the children, the young age of the children, and the significant amount of time the children spent in State custody pending resolution of the case, a reasonable person could agree with the district court's conclusion that termination was in their best interests.

We find no error in any legal conclusions by the district court. We find the court did not abuse its discretion in any way. The court acted properly and in the best interests of these two young children.

Affirmed.