NOT DESIGNATED FOR PUBLICATION

No. 123,202

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

In the Interests of W.R., E.R., and A.R.,
Minor Children.

MEMORANDUM OPINION

Appeal from Crawford District Court; MARY JENNIFER BRUNETTI, judge. Opinion filed March 26, 2021. Affirmed.

*Amy. R. Ross*, of Columbus, for appellant natural mother.

*Reina Probert*, county attorney, for appellee.

Before BUSER, P.J., ATCHESON and SCHROEDER, JJ.

PER CURIAM: This is a termination of parental rights case. The district court terminated Mother's parental rights to her three children, E.R. (YOB 2010), W.R. (YOB 2015), and A.R. (YOB 2016). Mother appeals, asserting that she presented sufficient evidence to rebut the presumption of unfitness for the foreseeable future. Upon our review, we affirm the district court's judgment.

FACTUAL AND PROCEDURAL BACKGROUND

In December 2016, the State filed petitions alleging that E.R., W.R., and A.R. were children in need of care. The petitions alleged similar facts. Of note, E.R. and W.R. had previously been in the custody of the Kansas Department for Children and Families (DCF) and had only been returned to Mother and Father in September 2016.

1

The children came to DCF's attention once again on December 20, 2016, when Mother called the police to the residence she shared with Father and the children. Mother asked the police to take her and the children away from the home. When officers arrived, Father was yelling profanity at the children and telling the police to get off his property and not to enter his house. Police were familiar with the couple due to prior domestic violence calls. DCF sought custody of the children based on the family's history, Father's noncooperation, concerns of domestic violence, the number of calls the family had made to the police, and concerns that neither parent was taking necessary medication. In addition to E.R., W.R., and A.R., Mother had born three other children, however, none of them lived at the residence or were in her care at this time.

On May 10, 2017, an adjudication hearing was held, and the district court ruled the children were in need of care as to both parents. Based on the evidence presented, the district court found "chronic domestic violence situations" involving the children. At a disposition hearing held shortly thereafter, the district court ordered the children to remain in DCF custody with placement out of the home.

A court-ordered case plan was developed for both parents to work towards reintegration with their children. KVC Health System (KVC) was contracted to assist Mother and Father in the reintegration process. The district court ordered Mother to complete a drug and alcohol assessment and follow all recommendations; submit to random urinalysis tests (UAs); complete a mental health intake and follow all recommendations; obtain and maintain employment; maintain suitable housing; sign all necessary releases; insure that no one older than 10 years old who has not passed a KBI/CANIS and random UA is around the children; keep KVC current with her contact information; and avoid negative law enforcement contacts.

2

Almost a year later, in April 2018, the State moved to terminate the parental rights of Mother and Father. The motion alleged that numerous statutory factors of unfitness were applicable to Mother:

- Failure of reasonable efforts made by appropriate public or private agencies to rehabilitate the family (see K.S.A. 2017 Supp. 38-2269[b][7]);
- Lack of effort on the part of the parent to adjust the parent's circumstances, conduct or condition to meet the needs of the children (see K.S.A. 2017 Supp. 38-2269[b][8]);
- The children have been in extended out of home placement as a result of actions or inactions attributable to the parents and one or more of the factors listed in K.S.A. 2017 Supp. 38-2269(c) apply. (see K.S.A. 2017 Supp. 38-2269[b][9]);
- Failure to pay a reasonable portion of the cost of substitute physical care and maintenance based on ability to pay. (see K.S.A. 2017 Supp. 38-2269[c][4]);
- Failure to carry out a reasonable plan approved by the court directed toward the integration of the children into the parental home (see K.S.A. 2017 Supp. 38-2269[c][3]); and
- That a presumption of unfitness should be applied because the children have been in an out-of-home placement, under court order, for a cumulative total period of one year or longer and the parent has substantially neglected or willfully refused to carry out a reasonable plan, approved by the court, directed toward reintegration of the child into the parental home. (see K.S.A. 2017 Supp. 38-2271[a][5]).

Finally, the State asserted that the above-mentioned factors were not likely to change in the foreseeable future and it was in the best interests of the children that parental rights be terminated.

The termination hearing occurred in October 2018. At that time, the district court terminated Father's parental rights and that ruling is not a part of this appeal. Mother stipulated to the facts in the State's motion except for any facts occurring before the children were taken into DCF custody in December 2016.

As set forth in the State's motion, there were numerous detailed facts tending to establish parental unfitness. Mother stipulated to completing a drug and alcohol evaluation in February 2017 but because she did not sign the necessary releases, KVC could not confirm this fact. When Mother did get the opportunity to participate in inpatient treatment in May 2017, she did not attend, claiming that she did not have transportation. Another attempt at inpatient treatment during the next month was unsuccessful. Mother returned to treatment in October 2017. Upon arrival, she had a large abscess on her arm from injecting drugs. Mother refused to participate during the first week, and she was ultimately dismissed from the program because she sold pills to other patients. Mother had a combination of negative and positive UAs, but she did not submit most of the requested UAs.

Regarding employment, Mother said she applied for several jobs, but never provided proof. The last time she provided evidence of a job search was September 2017. Mother was evicted in April 2017 and was living with friends during the time the State moved to terminate her parental rights. Mother also stipulated to failing to engage with mental health services. Mother did sign releases for three different drug treatment centers, but she did not sign releases for her children to receive therapy which meant that her children could not participate in services. According to the stipulated facts, Mother's visitations with her children were inconsistent. She attended a two-hour visitation in February 2017 but missed several others because of positive UA results or refusals. When E.R. saw her Mother and Father in court in May 2017, KVC staff observed a major change in E.R.'s mood. When she arrived in court, E.R. was happy but after seeing her

4

parents she "had little to no emotion and seemed very uncomfortable." Mother ceased contact with KVC in February 2018.

In addition to the factual stipulations, Mother also stipulated that she was unfit to parent and that a presumption of unfitness applied to her case under K.S.A. 2017 Supp. 38-2271(a)(5) due to the children being in an out-of-home placement for longer than a year. Given her stipulations, the parties asked the district court to continue Mother's termination hearing for several months. At that time, Mother would have an opportunity to rebut the presumption of unfitness. The district court also could assess whether Mother's unfitness was unlikely to change in the foreseeable future. The district court continued the termination hearing, which was subsequently held about 10 months later, in August 2019.

The August 2019 termination hearing included testimony from KVC case manager Christina Platt and Mother. Five KVC reports to the district court spanning July 2018 to July 2019 were admitted in evidence. The most recent report indicated that Mother had completed almost every task ordered by the district court. Mother completed inpatient drug treatment, maintained contact with KVC, provided negative UAs, maintained employment at Pitt Plastics, obtained stable housing, and signed all releases. Platt's February 2019 case report stated that Mother worked harder in six months than most parents work during their entire case plan.

A major concern undergirding the State's recommendation to terminate Mother's parental rights, however, was Mother's relationship with Michael Dutro. Mother met Dutro while they were both receiving inpatient drug treatment. Importantly, Dutro could not pass a KBI or CANIS check because he had a prior conviction for a felony—aggravated assault. Mother allowed Dutro and others to visit her home without the required background checks.

5

At some point, W.R., who was four years old at the time of the hearing, reported to his therapist that Dutro hit him in the head. After hearing about this allegation, Platt sent KVC staff to investigate. Mother had previously told Platt that Dutro could not pass a background check and, consequently, she would not have him around her children. However, when KVC staff went to Mother's home, Dutro was there. The staff member informed Dutro that he needed to leave and that background checks needed to be completed. When the staff member returned several hours later, however, Dutro was sitting on the porch. And when KVC staff came back a few hours later, Dutro was found hiding in the laundry room. As a result, the KVC staff performed an emergency removal of the children because they were afraid for the children's safety. Mother was reluctant to have Dutro leave, which indicated to Platt that "she was not worried about the situation."

Platt opined that Dutro distracted Mother and prevented her from giving the children necessary attention. Of note, Dutro went to the KVC office in the week before the August hearing. He provided a negative UA and asked to be assigned case plan tasks.

At the hearing, Mother testified on her own behalf. She said that Dutro was not a concern and that he was great with her children. Mother said if the court ordered her not to have contact with Dutro she would do it for her children. Mother, who was on probation and supervised by Community Corrections, testified she was "shock[ed]" to find out that Dutro was also on probation although she knew he had been on probation in the past. Despite admitting that she was not supposed to date other people on probation, Mother never disclosed the relationship to her probation officer. A probation officer who supervised Dutro confirmed that he was on probation for attempting to elude, disorderly conduct, and criminal damage to property.

Considerable evidence was admitted regarding the wellbeing of the children. In the summer of 2018, E.R. began displaying several concerning behaviors, including enuresis and encopresis, aggression, and sexualized behavior. E.R. had been placed

separately from W.R. and A.R. but moved in with her siblings' foster parents in May 2018. W.R., who had exhibited spitting and biting issues in the past, experienced a resurgence in these behaviors after E.R. arrived. By July 2018, E.R.'s sexualized behavior raised enough concern that her foster parents removed her from the home out of concern for the safety of their biological child and E.R.'s two younger siblings. E.R. did well in her new placement until September 2018, when her therapist began preparing E.R. for visits with Mother. After that, E.R. began wetting herself at school, at home, and during the night.

Mother was able to resume visitation with E.R. via Skype in January 2019. The court report said that E.R.'s reaction to seeing Mother was good, and although she exhibited "some behaviors since the visitation . . . that was to be expected." The report described their first in-person visit in February 2019 as "a wonderful reunion" and reported no concerns during the visits. Whereas E.R. expressed hesitancy about initially seeing Mother, she began to "express[] joy and desire to continue visiting with [Mother]."

By February 2019, Mother had only just resumed visitation with E.R., and had not seen W.R. or A.R. for over a year. KVC staff expressed concerns that Mother would not be able to handle the "very challenging" and "extreme behaviors" of the children.

Between February and May 2019, Mother's visits transitioned from supervised to overnight and weekend visits with all three children One visit in April was cancelled due to Mother not complying with the order that she should not allow anyone around her children without a background check. KVC staff expressed concern that Mother had taken E.R. to Oxford House, an addiction recovery facility, to visit Dutro. Mother also allowed people to visit her home without background checks and she took her children to Narcotics Anonymous meetings.

KVC staff was "not completely confident" that the children should be returned to Mother as of May 2019. KVC staff thought Mother's actions in bringing the children around unapproved people prevented her from successfully reintegrating with the children. Additionally, Mother also failed to obtain appropriate childcare. KVC staff were also troubled that Mother's home was unsafe. They noted that Mother had dangerous items within reach, including razors, chemicals, medications, flat irons, candle melting pots with long cords, and hot plates with long cords, despite being "told repeatedly to make household corrections." Additionally, Mother had missed two of her last three lithium pill counts.

Compounding the difficulty with reintegration, W.R. and A.R.'s foster parents stated that W.R. occasionally exhibited unprovoked aggression which necessitated constant supervision for safety reasons. Additionally, A.R. would bite herself which required counseling from a behavioral specialist.

The final court report prepared by KVC and issued the month prior to the August 2019 termination hearing detailed additional problems with the reintegration plan. E.R.'s relationship with her foster parents had disintegrated since the last report. Once her visits with Mother became more frequent, E.R. became more violent, refused to listen to her foster parents, and acted cruelly on occasion. When Mother visited the home, she observed E.R. hit a foster parent in the head but Mother did not admonish E.R. that her behavior was unacceptable.

W.R. and A.R. were scheduled to move into Mother's home, but Mother's lies regarding Dutro prevented the move. As a result, the children were moved to a new placement, with plans to move them again soon thereafter. Both placements reported that the children misbehaved after visits with Mother. Their behaviors were described as "out of control." They hit, kicked, fought, and bit each other. A.R.'s self-biting went from "almost extinct" to "often." The placements reported that A.R. and W.R. needed constant

supervision and could not be left alone for any reason. The KVC report stated that "[t]he children are all emotionally regressing and this is a major concern."

E.R. was discharged from family therapy in mid-July 2019, due to her inability to make progress with her mother or foster parents. E.R. disclosed to her individual therapist that she had seen Dutro on numerous occasions and that she was expected to babysit her siblings while Mother and Dutro slept. These disclosures resulted in reduced visits with Mother. After the visits decreased, E.R. "completely shut down with her therapeutic team" and would not discuss Mother's home or her visits. The therapeutic team surmised that this was E.R.'s way to cover up Mother's inadequate handling of her parental responsibilities.

During the last reporting period, the children's foster parents helped Mother financially by purchasing groceries, clothes, diapers, and providing cash assistance. After learning that the foster parents told KVC staff about the assistance, however, Mother spoke negatively about them.

At the conclusion of the KVC report, Platt listed numerous factors in support of her recommendation that Mother's parental rights should be terminated. Platt noted that while Mother had months to prepare her home for her children's return, she did not secure childcare. Instead, she relied on Dutro and her eight-year-old child. Platt indicated that when she called Mother on multiple occasions, Mother would be screaming at the children. On many occasions, when Mother was asked if she could handle the responsibility of parenting her three children, Mother "would cry and state that it was hard or laugh and say they were like 'baby fight club but she could handle it.'"

Platt was also worried that Mother could not financially take care of the children without outside assistance. As mentioned earlier, foster parents bought Mother groceries, clothing, and gave her cash. Both placements said Mother asked them to purchase phone

9

cards for her. For its part, KVC provided gas cards and Catholic Charities paid Mother's gas bill. KVC and the foster parents helped Mother furnish her home with a couch, dishes, and other household items. Given this substantial charitable assistance, Platt was not convinced that Mother could provide for the children on her own.

Finally, Platt expressed serious concerns regarding Mother's relationship with Dutro and its effect on the children. She reported that the children were referring to Dutro as "daddy." Her concerns ranged from W.R.'s report that Dutro hit him in the head to E.R. being tasked with watching the two younger children while Mother and Dutro slept. Platt testified that Mother ignored repeated warnings not to allow Dutro around the children and, as a result, she concluded that Mother chose to place her own needs above those of her children. Since Platt believed it was important for Mother to focus on her relationship with the children, she opined that adding Dutro into the family relationship was detrimental to the children.

In closing arguments, the guardian ad litem, Mark Fern, recommended against termination. Fern believed that Mother had addressed all the issues that brought about the CINC filing. Despite the falsified information on Dutro's background check, and the fact that he could not pass the background test, Fern was not convinced Dutro posed a specific threat to the children. He argued that Mother met her burden of showing that her behavior was likely to change in the foreseeable future. The State reprised its arguments in favor of terminating Mother's rights to her children. The district court took the case under advisement.

Shortly thereafter, the district court ordered the termination of Mother's parental rights. It found clear and convincing evidence that Mother was unfit by reason of conduct or condition which rendered her unable to care properly for her children now and in the foreseeable future. In its ruling, the district court acknowledged that Mother made progress on her case plan in late 2018 and during 2019. However, the district court did

not believe that Mother's progress was sufficient to rebut the presumption of unfitness. It explained that Mother "repeatedly placed her perceived needs over her young children." The district court stated that Mother "lacks accountability and does not readily accept responsibility for her circumstances or the choices that she makes when they do not go as she anticipates." The district court did not believe, based on the evidence, that Mother was able to parent and provide her children with stability.

Mother appeals.

### TERMINATION OF PARENTAL RIGHTS

Mother contends that she provided sufficient evidence to rebut the presumption of unfitness for the foreseeable future. In particular, she focuses on the positive reports on her progress in the months prior to the continuation of the termination hearing while minimizing the issues regarding her relationship with Dutro by arguing that his presence raised no specific concerns. In response, the State supports the district court's finding that Mother did not rebut the presumption of unfitness, and that the unfitness would not change in the foreseeable future.

The standard of review for district courts provides:

> "When the child has been adjudicated to be a child in need of care, the court may terminate parental rights or appoint a permanent custodian when the court finds by clear and convincing evidence that the parent is unfit by reason of conduct or condition which renders the parent unable to care properly for a child and the conduct or condition is unlikely to change in the foreseeable future." K.S.A. 2019 Supp. 38-2269(a).

Mother stipulated to five statutory factors of unfitness and to the application of the presumption of unfitness because the children had been in out-of-home placements, under court order for a cumulative total period of more than one year and Mother had

substantially neglected or willfully refused to carry out a reasonable plan, approved by the court, directed toward reintegration of the children into the parental home. See K.S.A. 2019 Supp. 38-2271(a)(5).

Upon the district court's finding that Mother was unfit to parent based on the statutory presumption, it was her burden of proof to rebut the presumption by a preponderance of evidence. K.S.A. 2019 Supp. 38-2271(b). In the absence of proof that Mother was presently fit and able to care for the children or that she would be fit and able to care for the children in the foreseeable future, the district court was authorized to terminate parental rights. K.S.A. 2019 Supp. 38-2271(b).

In making a parental termination decision, the district court must consider whether the termination is in the best interests of the child. K.S.A. 2019 Supp. 38-2269(g)(1). In making this determination, the district court must "give primary consideration to the physical, mental and emotional health of the child." K.S.A. 2019 Supp. 38-2269(g)(1).

Our standard of review provides that when an appellate court reviews a district court's termination of parental rights, it should "'consider whether, after review of all the evidence, viewed in the light most favorable to the State,'" it is "'convinced that a rational factfinder could have found it highly probable, *i.e.*, by clear and convincing evidence, that the parent's right should be terminated.'" *In re K.H.*, 56 Kan. App. 2d 1135, 1139, 444 P.3d 354 (2019). In reviewing a district court's decision based on a clear and convincing evidence standard, an "appellate court does not weigh conflicting evidence, pass on credibility of witnesses, or redetermine questions of fact." *In re B.D.-Y.*, 286 Kan. 686, 705, 187 P.3d 594 (2008). With these standards in mind, we turn to the merits of Mother's appeal.

In its termination order, the district court's major concern was with the deleterious effects on the children from Mother's relationship with Dutro. The district court described

Mother's "actions of introducing into her family circle a man who has a violent criminal history with dependency issues" and "feign[ing] she has no idea when questioned about his inability to pass a KBI background or the fact that he submitted falsified documentation to KVC" as "disingenuous and insulting to the Court." The district court found that Mother ignored the KVC's directive to cease contact with Dutro and lied about his presence to KVC officers. In particular, the district court was concerned that Mother allowed Dutro to watch her children rather than obtaining approved caretakers. According to the district court, "[t]he fact that [Mother] had limited time with her children and had [Dutro] present and involved is also disturbing, especially in light of the fact that [Mother] has never been a full-time parent with all three children in her home." The district court characterized Mother's relationship with Dutro as "a fundamental flaw in the ability for [Mother] to do what is in her children's best interests."

The district court's findings that Mother's relationship with Dutro and his presence around the children prevented the successful reintegration of Mother with her children was well supported by the evidence. Mother had met Dutro while they were both receiving inpatient drug treatment. Dutro had a history of violence as exemplified by his prior conviction for aggravated assault. During the CINC proceedings, Dutro was on probation for other crimes of violence—attempting to elude, disorderly conduct, and criminal damage to property. This violent history took on special relevance upon W.R.'s report that Dutro had hit the four-year-old in the head.

Despite this violent history, which precluded Dutro from passing the required KBI or CANIS background checks for interacting with the children, Mother repeatedly violated her case plan orders by having her children around Dutro and others who had not passed background checks. Mother's deceit in this regard was troubling to the district court which had evidence that Mother continually lied regarding Dutro not being around the children. This dishonesty also was shown when Mother, who was on probation during

13

the CINC proceedings, violated her probation condition by dating Dutro and not disclosing the relationship to her probation officer.

Mother's continued relationship with Dutro was harmful to her children. Mother was fully informed that her continued association with Dutro would negatively impact visitation with her children and ultimately reunification. When visitation was restricted after Mother repeatedly refused to keep Dutro away from the children, they suffered additional disruption and a loss of parental love and emotional support. Mother also lost the opportunity to demonstrate that she could parent all three children by herself.

With the children's mental health and behavioral issues, it was especially important that Mother focus her attention on them. These issues were significant—including behaviors that resulted in the children harming themselves and others. But after years of court intervention, there was scant evidence that Mother was able to care for the children's special mental health and behavioral needs. Instead, Mother's caseworker heard Mother screaming at the children multiple times when Mother knew she was being observed. Mother also made the arrangement of having E.R. babysit the other two children. This decision was especially thoughtless because of E.R.'s history with sexualized behavior and aggression.

Our court has previously upheld a termination of parental rights in a case wherein the Mother's relationship with a boyfriend violated her case plan. *In In re V.F.*, No. 113,295, 2015 WL 5311982 (Kan. App. 2015) (unpublished decision), the district court continued a termination proceeding after the State reported that Mother was "'doing fairly well'" with her case orders. 2015 WL 5311982, at *2. Six months later, and over two years after the filing of the CINC petition, however, the district court commenced the termination hearing.

14

Mother had recently been evicted from her residence after having an unauthorized male roommate. The roommate was Mother's boyfriend, R.R. Mother's case worker told her that if R.R. was going to associate with her and her child that he needed to complete an assessment and background check. Mother advised that R.R. would not be living in Kansas much longer. Despite Mother's assurances, the child began saying "'going to see mommy and daddy'" when she left for visits at Mother's new residence. 2015 WL 5311982, at *3. During a walkthrough of the new residence, case workers found R.R. hiding in the basement. Although domestic abuse was suspected, Mother denied any such incidents. At the termination hearing, Mother revealed that she was eight months pregnant with R.R.'s child. Mother was also alleged to abuse alcohol.

In *In re V.F.*, like the case on appeal, the district court acknowledged that Mother took positive steps towards reintegration and almost fully complied with the district court's orders. But it also found that "'the level of deceit by mom is, I dare say, unprecedented in this court.'" 2015 WL 5311982, at *8. The court terminated Mother's rights. On appeal, Mother argued that the district court relied too heavily on her deceitfulness regarding her relationship with R.R. We affirmed the district court's ruling.

In *In re V.F.*, our court found that the evidence supported the district court's conclusion that, among other factors, Mother's deceit with respect to R.R. and her relationship with him hindered the State's ability to assess whether the child would be safe in his presence. The court found this "especially troubling because [Mother] was fully and repeatedly advised of the importance of telling the truth regarding [R.R.]." 2015 WL 5311982, at *9.

Returning to the case on appeal, all things considered, there was substantial competent evidence to support the district court's conclusion that despite the necessity for Mother to keep her children safe and protected from untoward influences, Mother either neglected or willfully refused to carry out a reasonable plan, approved by the court,

15

directed toward reintegration of the children into the parental home. See K.S.A. 2019 Supp. 38-2271(a)(5). Moreover, this evidence also showed how Mother was unwilling or unable to adjust her circumstances, conduct, or conditions to meet the needs of E.R., W.R., and A.R. See K.S.A. 2019 Supp. 38-2269(b)(8).

The district court also found that Mother's parental unfitness would not change in the foreseeable future. In this regard, the district court stated, "Obviously, the term foreseeable future is measured from the children's perspective and the Court is faced with predicting a parent's future of unfitness based on past history." The district court observed that Mother and the children had been involved with the CINC procedures for several years. Significantly, CINC proceedings had encompassed the entire lifetimes of W.R. and A.R., and half the lifetime of E.R.

During this time period, the district court found that "KVC has exhaustedly attempted to assist [Mother]." But despite having both time and outside resources, Mother "repeatedly demonstrated an unwillingness to fully commit to a plan for reintegration." She refused to sign waivers and consents throughout the case, even when doing so delayed services for her children. The district court noted that Mother was also argumentative with KVC staff and foster families. Still, Mother relied on private and governmental assistance for basic items like cash, food, gas cards, phone cards, diapers, clothing, and home furnishings.

Our court has frequently observed: "In determining whether a parent's conduct or condition is likely to change in the foreseeable future, the foreseeable future is to be considered from the child's perspective, not the parents', as time perception of a child differs from that of an adult." *In re S.D.*, 41 Kan. App. 2d 780, Syl. ¶ 9, 204 P.3d 1182 (2009).

16

In this case, the children were removed from Mother's custody in December 2016 and remained apart from her through the time of the termination hearing in August 2019. W.R. and A.R. were babies when they were removed and have spent almost their entire lives in State care. E.R. had recently turned six when she was adjudicated a child in need of care. Because she was only placed with her siblings briefly, E.R. spent the last few years minimally involved with her biological family.

In short, evidence showed that Mother was given a second chance after she stipulated to her parental unfitness, and she had ample time to prepare her home, organize her finances, and develop a parental relationship with the children. However, Mother did not avail herself of this opportunity. Her failure to reintegrate with her family despite the lengthy duration of this case provides support for the district court's conclusion that Mother would not change in the foreseeable future.

Lastly, although Mother does not appeal the district court's legal conclusion that termination of parental rights was in the best interests of the children, there was sufficient competent evidence to support this finding. The district court found that E.R., W.R., and A.R. had regressed in their behaviors, something that was "of paramount importance and also very telling to th[e] court." The district court highlighted the children's "biting, the continued and protracted dysregulation, the urinating during the day and simply spinning out of control when having contact with [Mother]," as well as E.R.'s sexualized behavior.

Indeed, there was considerable evidence of the children's relapsing mental health problems and behaviors to support the district court's legal conclusion. We are persuaded the district court did not abuse its discretion in concluding that it was in the children's best interests to live "in stable homes where they could receive structure, guidance, love, support, and ongoing therapy, and I do not believe that is available in [Mother's] home."

In conclusion, upon our consideration of all the evidence, viewed in the light most favorable to the State, we are convinced that a rational fact-finder could have found the evidence highly probable that Mother's parental rights should be terminated. See *In re K.H.*, 56 Kan. App. 2d at 1139.

Affirmed.